# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **THE CITY OF PRICHARD, ALABAMA,** | ) | FILED JAN 14 '04 PM 3 :52 USDCALS |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 03-248-P-C** |
| | ) | |
| **LEVEL 3 COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Plaintiff.** | ) | |

## DEFENDANT LEVEL 3 COMMUNICATIONS'
## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

H. William Wasden (WASDW4267)
W. Perry Hall (HALLW9043)
BOWRON, LATTA & WASDEN, P.C.
Post Office Box 16046
Mobile, Alabama 36616
Telephone:     251-344-5151
Facsimile:     251-344-9696


T. Scott Thompson
K.C. Halm
COLE, RAYWID & BRAVERMAN, LLP
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC  20006
Telephone:     202-659-9750
Facsimile:     202-452-0067

**Attorneys for Level 3 Communications, LLC**

# TABLE OF CONTENTS

I.   STATEMENT OF THE CASE.................................................................................... 1

II.  FACTUAL SUMMARY ......................................................................................... 2
   A.  Level 3 And Its Need To Construct In The City Of Prichard ............................ 2
   B.  The City's Barriers To Level 3's Entry ............................................................ 2
   C.  The Provisions Of Resolution 800-99............................................................... 3
   D.  The "Interim" Agreement ................................................................................. 4
   E.  The Terms Of The Interim Agreement ............................................................. 5
   F.  The City's Treatment Of BellSouth.................................................................. 6

III. SUMMARY JUDGMENT STANDARD ........................................................... 7

IV.  THE CITY'S ACTIONS AND DEMANDS IMPOSED ON LEVEL 3 VIOLATE 47
    U.S.C. § 253...................................................................................................... 7
   A.  The Standards For Municipal Conduct Under Section 253 Are Well-Established ............ 7
     1.   The Statutory Text ...................................................................................... 7
     2.   Section 253(a) Is A Broad And Virtually Absolute Limitation On Local Authority ..... 8
   B. The City's Actions And The Terms And Conditions Imposed On Level 3 Violate Section
     253(a) ........................................................................................................ 11
     1. The City's Treatment Of BellSouth Creates A Discriminatory And Competitively Biased
     Barrier To Entry ........................................................................................ 11
     2. The City's Exercise Of Unfettered Discretion Over Level 3's Ability To Provide
     Telecommunications Services Violated Section 253(a) ................................... 12
   C. The Terms And Conditions Imposed By The City Are Not Within The City's Authority
     Reserved Under Section 253(c) ........................................................................ 15
     1. The City's Requirements, Including The Fees, Are Not Competitively Neutral And
     Nondiscriminatory ..................................................................................... 15
     2. The Fees And In-kind Compensation Requirements Are Not Fair And Reasonable, And
     Were Not Publicly Disclosed........................................................................ 16
     3. The City's Requirements Are Not Limited To Management Of The Public Rights-Of-
     Way ........................................................................................................ 19
     4.   *BellSouth v. City of Mobile* Supports Level 3's Claims............................... 20

V.   THE FEES IMPOSED ON LEVEL 3 ARE AN UNLAWFUL TAX ................................. 21

VI.  THE CITY HAS BREACHED THE INTERIM AGREEMENT AND THE COVENANT
    OF GOOD FAITH AND FAIR DEALING.................................................................. 25
   A.  The City Has Breached The Interim Agreement ............................................. 25
   B.  The City Has Breached The Covenant Of Good Faith And Fair Dealing ........................ 27

VII. THE CITY'S ACTIONS VIOLATED LEVEL 3'S FEDERAL RIGHTS CREATING
    LIABILITY UNDER SECTION 1983 ....................................................................... 29

VIII. CONCLUSION.................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

Page

*Ala. Farm Bureau Mutual Casualty Ins. Co. v. City of Hartselle,*
460 So. 2d 1219 (Ala. 1984) ................................................................................. 22

*Armstrong Business Services, Inc. v. AmSouth Bank,*
817 So.2d 665 (Ala. 2001) ..................................................................................... 25

*Ashwander v. Tenn. Valley Auth.,*
297 U.S. 288 (1936) ................................................................................................ 21

*AT&T Communications of the Southwest, Inc. v. City of Austin,*
975 F. Supp. 928 (W.D. Tex. 1997), vacated on other grounds,
243 F.3d 928 (5th Cir. 2001) ................................................................................. 10

*AT&T Communications of the Southwest, Inc. v. City of Dallas,*
8 F. Supp. 2d 582 (N.D. Tex. 1998),
vacated on other grounds, 243 F.3d 928 (5th Cir. 2001) ............................... 9

*AT&T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366 (1999) ....................................... 8

*Bell Atlantic-Maryland, Inc. v. Prince George's County,*
49 F. Supp. 2d 805, 817-19 (D. Md. 1999),
vacated on other grounds, 212 F.3d 863 (4th Cir. 2000) ............................. 9, 11, 17, 18

*BellSouth Telecomms., Inc. v. Town of Palm Beach,*
252 F. 3d 1169 (11th Cir. Fla. 2001) ................................................................... *passim*

*BellSouth Telecommunications, Inc. v. City of Coral Springs,*
42 F. Supp. 2d 1304 (S.D. Fla. 1999) ................................................................. 9, 14

*BellSouth Telecommunications, Inc. v. City of Mobile,*
171 F. Supp. 2d 1261 (S.D. Ala. 2001) ............................................................... 16, 17, 20

*BellSouth Telecommunications, Inc. v. Town of Palm Beach,*
127 F. Supp. 2d 1348 (S.D. Fla. 1999) ............................................................... 10

*Blessing v. Freestone, 520 U.S. 329 (1997) ...................................................... 29

*City of Auburn v. Qwest Corp.,*
260 F.3d 1160 (9th Cir. 2001), cert. denied, 534 U.S. 1079 (2002) ............... *passim*

*City of Mobile v. GSF Properties, Inc.,*
531 So. 2d 833 (Ala. 1988) ................................................................................... 22

*Douglas v. Seacoast Products, Inc.,*
   431 U.S. 265, 271-72 (1977) ............................................................................ 21

*Gonzaga Univ. v. Doe,*
   536 U.S. 273 (2002) ........................................................................................... 29

*Haygood v. Younger,*
   769 F.2d 1350 (9th Cir. 1985) ......................................................................... 29

*Henry v. Shevinsky,*
   239 Ala. 293 (Ala. 1940) .................................................................................. 25

*Hicks v. Alabama,*
   45 F. Supp. 2d 921 (S.D. Ala. 1998) .................................................................. 7

*Hoffman-La Roche v. Campbell,*
   512 So.2d 725 (Ala. 1987) ........................................................................... 27, 28

*Lightwave Technologies, LLC v. Escambia County,*
   804 So. 2d 176 (Ala. 2001) ............................................................................... 23

*Moore v. Iron Will, Inc.,*
   2001 U.S. Dist. LEXIS 2605 *8 (S.D. Ala. Feb. 21, 2001) ............................... 7

*Monell v. Department of Social Serv. of N.Y.,*
   436 U.S. 658 (1978) ........................................................................................... 29

*PECO Energy Co. v. Township of Haverford,*
   1999 U.S. Dist. LEXIS 19409 (E.D. Pa., Dec. 20, 1999) ......................... 9, 10, 11, 16

*Qwest Comm. Corp. v. City of Berkeley,*
   255 F. Supp.2d 1116 (N.D. Calif. 2003) ................................................ 9, 10, 11, 13

*Rochelle v. Florence,*
   188 So. 247 (Ala. 1939) ..................................................................................... 24

*RT Communications, Inc. v. FCC,*
   201 F.3d 1264 (10th Cir. 2000) ........................................................... 10, 11, 13, 15

*Stedman v. Bizmart,* 219 F. Supp. 2d 1212 (S.D. Ala. 2002) ............................. 7

*Swift & Co. v. Wickham,* 382 U.S. 111 (1965) .................................................. 22

*TC Systems, Inc. v. Town of Colonie,*
   263 F. Supp. 2d 471 (N.D.N.Y. 2003) ........................................................ 9, 11, 16

*TCG New York, Inc. v. City of White Plains,*
  305 F.3d 67 (2d Cir. 2002), cert. denied, 123 S.Ct. 1582 (2003) ......................................... *passim*

*United States v. Mallard,*
  2003 U.S. Dist. LEXIS 5619, *3 (S.D. Ala. Mar. 10, 2003) ........................................................ 7

*Webb v. Sloan,*
  330 F.3d 1158 (9th Cir. 2003) .................................................................................................... 29

*XO Missouri, Inc. v. City of Maryland Heights,*
  256 F. Supp. 2d 987 (E.D. Mo. 2003)............................................................... 9, 10, 11, 17

## Statutes

42 U.S.C. § 1983................................................................................................................... 1, 29
47 U.S.C. § 251....................................................................................................................... 12
47 U.S.C. § 252....................................................................................................................... 12
47 U.S.C. § 253.................................................................................................................. *passim*
Ala. Code § 23-1-85............................................................................................................. 2, 3, 5
Alabama Code § 11-51-128.................................................................................................. 22, 23

## Other Authorities

*In re Classic Telephone, Inc.,*
  11 F.C.C.R. 13,082 (FCC 1996) ................................................................................................ 18

*Silver Star Tel. Co.,*
  12 F.C.C.R. 15639, 15658 (1997)............................................................................................... 15

*TCI Cablevision of Oakland, Inc.,*
  12 F.C.C.R. 21396, 21443, ¶ 108 (1997) .................................................................................. 15

141 Cong. Rec. S8172 (daily ed. June 12, 1995).......................................................................... 18

**DEFENDANT LEVEL 3 COMMUNICATIONS'
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rules 7.1, 7.2, Defendant, Counterclaim

Plaintiff Level 3 Communications, LLC ("Level 3") respectfully submits the following

memorandum of points and authorities in support of its Motion for Summary Judgment on all

Counts of its Counterclaims, and the Plaintiff City of Prichard's Complaint.

## I.   STATEMENT OF THE CASE

In this case, the City of Prichard ("City") seeks to require Level 3 to pay the over $90,000

annual fee set forth in an "interim agreement" executed by the parties in 1999. In defense, Level

3 has stated affirmative defenses and counterclaims alleging that the annual fees that the City

seeks to enforce, as well as the actions and requirements imposed by the City, including but not

limited to the terms of the interim agreement, are unenforceable as in violation of the Federal

Telecommunications Act, 47 U.S.C. § 253, and Alabama limitations on municipal

telecommunications taxes. In addition, Level 3's affirmative defenses and counterclaims allege

that to the extent the interim agreement is valid, the City has breached the agreement and

breached the covenant of good faith and fair dealing to Level 3's harm, and as a result, the City

is liable to Level 3 for damages. Finally, Level 3 alleges that the City is liable to Level 3 for

damages under 42 U.S.C. § 1983 for violation of Level 3's federal rights.

The following, in addition to Level 3's accompanying Statement Of Material Facts Not In

Dispute ("SMF"), demonstrates that there is no genuine issue as to any material fact and that

Level 3 is entitled to judgment, as a matter of law, on its Second, Third, Fourth, Fifth, Sixth,

Seventh, Ninth, and Tenth affirmative defenses and all counts of its counterclaims.

## II.    FACTUAL SUMMARY

Level 3 does not here repeat all the facts set forth in its Statement Of Material Facts Not In Dispute ("SMF"), but for the Court's convenience summarizes the significant undisputed facts that, when applied to the established law, demonstrate that Level 3 is entitled to summary judgment. Level 3 otherwise incorporates by reference its accompanying SMF.

### A.    Level 3 And Its Need To Construct In The City Of Prichard

Level 3 is a provider of telecommunications services. In 1999, the Alabama Public Service Commission ("PSC") found it in the public interest to authorize Level 3 to provide Local Exchange and Toll Telephone services within the State of Alabama. (SMF ¶¶ 3-4). Pursuant to PSC regulation, Level 3 has filed tariffs with the PSC offering to provide Switched Access, Intrastate Access, and Interexchange services in Alabama. (SMF ¶¶ 5-8). Under those tariffs, Level 3 is required to provide the offered service to any qualified person that requests the service.

In addition, Level 3 holds a state-wide franchise authorizing it to construct its lines "along the margin of the right-of-way of public highways. . . ." Ala. Code § 23-1-85.

In order to provide its services, in 1999 and 2000, Level 3 constructed a national fiber optic network. Level 3's network is a self-healing redundant ring architecture. (SMF ¶¶ 16-17).

### B.    The City's Barriers To Level 3's Entry

Level 3 first contacted the City in July, 1999, and requested access to the public rights-of-way in the City to construct and operate its facilities for the provision of telecommunications services. (SMF ¶ 22). At that time, the City had in place Ordinance No. 1736, governing the issuance of street excavation permits. (SMF ¶ 23; Def. Exh. 10). The City's street excavation Ordinance included provisions concerning bonds, insurance, indemnification, and compensation

2

of the City's costs. (Def. Exh. 10)  The street excavation Ordinance did not require that an

applicant have a franchise or license from the City in order to be issued a permit.  (*Id.*).

    In response to Level 3's request for access, the City did not allow Level 3 to obtain

permits pursuant to the City's existing street excavation Ordinance.  Rather, when Level 3's

representatives met with City Officials it was made clear that Level 3 would be required to

accept certain conditions before the City would grant Level 3 access to the City streets and

public rights-of-way.[1]  (SMF ¶¶ 30-34).  Those terms and conditions, however, were not

identified in any City Ordinance, Resolution, or other official City enactment.  (SMF 37-39).

Indeed, the City had no other ordinance or regulations establishing the procedures that a

telecommunications provider must follow to obtain access to the public rights-of-way in the City,

or the standards or criteria that govern the City's evaluation of a telecommunications provider's

request for access to the public rights-of-way in the City.  (SMF ¶¶ 27, 37-39).  Rather, they

would be determined based on the discretion of the City Council and Mayor.

### C.    The Provisions Of Resolution 800-99

    After Level 3's request to construct, on November 16, 1999, the City adopted Resolution

800-99.  (SMF ¶ 40).  In Resolution 800-99, the City expressed the City's desire to develop a

permanent, comprehensive ordinance to address the use of the City's public rights-of-way by

telecommunications providers.  (SMF ¶ 41).  Specifically, Resolution 800-99 states that it is the

City's "intent to develop and administer the use of rights-of-way pursuant to a regulatory

resolution that will provide uniform standards applicable to all users [of the public rights-of-

way]."  (SMF ¶ 42).  The Resolution also expressed the City's view that it is "essential that a

---

[1] It is public knowledge, of course, that the same officials that were shaking down Level 3 in late 1999 were shortly thereafter removed or forced from office under a cloud of corruption. *See, e.g.*, E. Curran, Mobile Register, Feb. 12, 2000, "Grand Jury Cites 'Corruption In Office.'"

plan and study of rights-of-way use, costs for such use, and valuation of occupancy be undertaken by the City to form the basis" for the permanent regulatory resolution that the City would adopt. (SMF ¶ 43).

Resolution 800-99 also establishes that a standard interim use agreement is to be used by the City with respect to, in theory, all telecommunications carriers occupying the City's rights-of-way, presumably until a cost study was prepared and a permanent license agreement and ordinance was adopted by the City. (SMF ¶ 44). Finally, the Resolution also directed the Mayor of the City to undertake a study of the costs of managing the City's rights-of-way, and to develop a right-of-way regulatory resolution, incorporating such cost study findings, "for consideration by the City . . . on or before January 31, 2000." (SMF ¶ 46).

Resolution 800-99 was adopted by the City Council only weeks before Level 3 was required to enter in to an agreement with the City as a condition of Level 3's gaining access to the public rights-of-way in the City.

**D.    The "Interim" Agreement**

On November 30, 1999, the City Council approved an "Interim Rights-of-Way Use Agreement" (the "Interim Agreement") pursuant to Resolution 800-99 setting forth the terms and conditions of Level 3's access to the public rights-of-way. (SMF ¶ 47). In order to obtain the City's approval for its construction, Level 3 executed the Interim Agreement on December 30, 1999. (SMF ¶ 48). Level 3 had no choice but to accept the terms and conditions imposed by the City in the Interim Agreement, as it would otherwise not have been permitted to construct its facilities in the City, and thus would not have been able to provide telecommunications services over its network. (SMF ¶¶ 49-51).

Level 3 accepted the terms of the Interim Agreement based on the representations made

4

by the City in the Interim Agreement and in Resolution 800-99. (SMF ¶ 52). Specifically, Level

3 relied upon the fact that the Interim Agreement specifically acknowledged that the City was at

that time developing, pursuant to Resolution 800-99, and the Telecommunications Act of 1996, a

permanent regulatory ordinance to govern the use of the City's rights-of-way by

telecommunications providers.  (SMF ¶ 53).  In addition, Level 3 relied on the City's

representations in Resolution 800-99 (which was incorporated by reference in to the agreement

between Level 3 and the City), that the City was to: (1) undertake a cost study to determine the

actual costs of managing the public rights-of-way; (2) develop a permanent regulatory resolution

incorporating the results of such cost study and implementing the requirements of federal law;

and (3) establish and apply the terms of the permanent regulatory resolution to all

telecommunications providers with facilities occupying the City's rights-of-way. (SMF ¶ 55).

Moreover, Level 3 relied on the representation of the City in Resolution No. 800-99 that the

terms of the Resolution and the model Interim Agreement were to be uniformly imposed on all

providers of telecommunications services who occupied public rights-of-way in the City. (SMF

¶ 56).

Nonetheless, Level 3 declined to waive any rights reserved under Alabama law or federal

law, including, but not limited to § 253 of the Telecommunications Act of 1996, to challenge the

unlawful provisions of the Interim Agreement. (SMF ¶¶ 57-58; Def. Exh. 18, Art. 2).

### E.    The Terms Of The Interim Agreement

The Interim Agreement requires Level 3 to pay to the City an annual fee of $2.50 per

linear foot for a period of 15 years. (Def. Exh. 18, Art. 4.2).  The Interim Agreement permits the

Annual Fee to be increased annually. (*Id.*)  The annual linear foot fee imposed in the Interim

Agreement does not reflect the City's reasonable or actual cost of managing Level 3's use or

occupation of the public rights-of-way in the City.  The Interim Agreement also requires Level 3

to provide an in-kind payment to the City by installing four (4) "singlemode dark fibers" (fiber

optic strands used to transmit optical signals) and associated appurtenances and facilities for the City's exclusive use. (Def. Exh. 18 Art. 9.4). Level 3 is required to bear the entire costs of construction and maintenance of the conduit and associated appurtenances and facilities for the City's exclusive use. (Def. Exh. 18 Art. 9.5). At the time imposed on Level 3 initially, and presently, the monetary and in-kind compensation imposed in the Interim Agreement, including the linear foot fee and the required dark fiber strands and associated appurtenances and facilities for the City's exclusive use, were not publicly disclosed by the City.

The Interim Agreement purports to permit Level 3 to encroach and occupy the public right-of-way for the purpose of constructing fiber optic lines and cables. The Interim Agreement requires Level 3 to obtain prior written consent of the City before any assignment or transfer of ownership in the Interim Agreement unless Level 3 remains solely responsible for installing, maintaining, replacing and removing all facilities in the Project.

## F.     The City's Treatment Of BellSouth

The Regional Bell Operating Company in the Southeastern United States, including Alabama, is BellSouth. (SMF ¶ 86). As such, BellSouth is Level 3's primary competitor for the provision of telecommunications services using the facilities located in Prichard. (SMF ¶ 87). Like Level 3, BellSouth has constructed facilities in the public rights-of-way in the City. (SMF ¶ 88). However, Bellsouth's facilities are more extensive and burdensome than Level 3's. (SMF ¶¶ 96-101). Yet, while the City imposed numerous barriers to Level 3's provision of telecommunications services, including ongoing annual fees in excess of $90,000 and the provision of in-kind compensation with a significant market value, it requires nothing of BellSouth. (SMF ¶¶ 89-95). BellSouth does not have an agreement with the City comparable to the one required of Level 3. Indeed, the City asserts that BellSouth has been occupying the public rights-of-way in the City without any authorization, apparently for decades. (SMF ¶ 90).

6

Moreover, BellSouth is not currently required to pay the City any monetary or in-kind fees for its use of the public rights-of-way. (SMF ¶ 92).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *United States v. Mallard*, 2003 U.S. Dist. LEXIS 5619, *3 (S.D. Ala. Mar. 10, 2003). "The substantive law will identify which facts are material and which are irrelevant." *Stedman v. Bizmart*, 219 F. Supp. 2d 1212, 1214 (S.D. Ala. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Moore v. Iron Will, Inc.*, 2001 U.S. Dist. LEXIS 2605. *8 (S.D. Ala. Feb. 21, 2001), (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Additionally, to defeat a motion for summary judgment, a "nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Hicks v. Alabama*, 45 F. Supp. 2d 921, 931 (S.D. Ala. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 586).

## IV.    THE CITY'S ACTIONS AND DEMANDS IMPOSED ON LEVEL 3 VIOLATE 47 U.S.C. § 253

### A.    The Standards For Municipal Conduct Under Section 253 Are Well-Established

#### 1.    The Statutory Text

With the Telecommunications Act of 1996, Congress sought to radically alter the landscape for the provision of telecommunications services. The fundamental goal of the 1996 Act was to reject the historical assumption of state-authorized monopolies[2] and to rely instead on

---

[2] Prior to the 1996 Act, many states legally prohibited competition in the provision of telecommunications services, thus granting a *de jure* as well as *de facto* monopoly to the

free market competition and private investment to determine what entities would provide

telecommunications services. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999).

A cornerstone implementing Congress' intention is Section 253, which is entitled

"Removal Of Barriers To Entry." 47 U.S.C. § 253. Section 253(a) states the overarching rule:

> (a) In General – No State or local statute or regulation, or other
> State or local legal requirement, may prohibit or have the effect of
> prohibiting the ability of any entity to provide any interstate or
> intrastate telecommunications service.

47 U.S.C. § 253(a). The intention of Section 253(a) was to remove the ability of State or local

governments from choosing or influencing who could provide telecommunications services.

Section 253(c) identifies the authority reserved to local governments. It provides:

> Nothing in this section affects the authority of a State or local
> government to manage the public rights-of-way or to require fair
> and reasonable compensation from telecommunications providers,
> on a competitively neutral and nondiscriminatory basis, for use of
> public rights-of-way on a nondiscriminatory basis, if the
> compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).

### 2. Section 253(a) Is A Broad And Virtually Absolute Limitation On Local Authority

The most recent and authoritative Circuit Court interpretations of Section 253(a) have

clearly held it to be a broad limitation on local authority.[3] *TCG New York, Inc. v. City of White*

---

incumbent Regional Bell Operating Company (in Alabama, BellSouth and its operating entities).
*AT&T Corp. v. Iowa Utils.*, 525 U.S. 366, 371, 119 S. Ct. 721, 142 L. Ed. 2d 834, 844 (1999)
(Noting that Congress "has ended the longstanding regime of state-sanctioned monopolies").

[3] The Eleventh Circuit has not interpreted the scope of Section 253's preemption. In *BellSouth
Telecommunications, Inc. v. City of Palm Beach*, 252 F.3d 1169, 1186, 1191-92 (11th Cir. 2001),
the court addressed only the proper analytical approach to Section 253, finding that a court must
first determine whether a Section 253(a) violation has occurred, and then turn to whether the
challenged provisions fall within the reserved authority in Section 253(c). The court, however,
did not address the substantive scope of Section 253.

*Plains*, 305 F.3d 67 (2d Cir. 2002), *cert. denied*, 123 S.Ct. 1582 (2003); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001), *cert. denied*, 534 U.S. 1079 (2002).

In *City of Auburn*, the Ninth Circuit described the Section 253(a) preemption as "virtually absolute" and stated that "**Congress has narrowly circumscribed the role of state and local governments in this arena.**" *Id.* at 1175 (emphasis added). In *City of White Plains*, the Second Circuit similarly articulated a broad view of the prohibition in Section 253(a), stating that the court "'considers whether the Ordinance *materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.*'" 305 F.3d at 76 (emphasis added).

The Second and Ninth Circuits' decisions followed the great weight of authority from the district courts, and have been subsequently followed. *See, e.g., TC Systems, Inc. v. Town of Colonie*, 263 F. Supp. 2d 471, 480 (N.D.N.Y. 2003); *XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp. 2d 987 (E.D. Mo. 2003); *Qwest Comm. Corp. v. City of Berkeley*, 255 F. Supp.2d 1116 (N.D. Calif. 2003); *Bell Atlantic-Maryland, Inc. v. Prince George's County*, 49 F. Supp. 2d 805, 817-19 (D. Md. 1999), *vacated on other grounds*, 212 F.3d 863 (4th Cir. 2000)[4]; *AT&T Communications of the Southwest, Inc. v. City of Dallas*, 8 F. Supp. 2d 582, 593 (N.D. Tex. 1998), *vacated on other grounds*, 243 F.3d 928 (5th Cir. 2001); *PECO Energy Co. v. Township of Haverford*, 1999 U.S. Dist. LEXIS 19409 (E.D. Pa., Dec. 20, 1999); *BellSouth Telecommunications, Inc. v. City of Coral Springs*, 42 F. Supp. 2d 1304 (S.D. Fla. 1999) *aff'd in part and rev'd in part sub nom., BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F. 3d 1169 (11th Cir. Fla. 2001) (consolidated on appeal with *BellSouth Telecommunications, Inc. v.*

---

[4] While the district court's decision in *Prince George's County* was vacated on other grounds, its detailed and thoughtful reasoning is nonetheless persuasive, and indeed, has been cited favorably

*Town of Palm Beach*, 127 F. Supp. 2d 1348 (S.D. Fla. 1999)); *BellSouth Telecommunications, Inc. v. Town of Palm Beach*, 127 F. Supp. 2d 1348 (S.D. Fla. 1999), *aff'd in part and rev'd and remanded in part*, 252 F. 3d 1169 (11th Cir. 2001) (affirming that portions of local ordinance were preempted by state law and reversing and remanding for District Court consideration of whether local ordinance violated Section 253(a)); *AT&T Communications of the Southwest, Inc. v. City of Austin*, 975 F. Supp. 928, 940 (W.D. Tex. 1997), *vacated on other grounds*, 243 F.3d 928 (5th Cir. 2001).[5]

It is equally clear that a municipal requirement need not be insurmountable in order to nonetheless have the effect of prohibiting the ability of an entity to provide telecommunications services. *White Plains*, 305 F.3d at 76; *RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000); *see also Auburn*, 260 F.3d at 1172 (Qwest had provided service for years in the City, yet a 253(a) violation was still established). The courts have recognized that when presented, the local requirements constituted a barrier to entry, and the mere fact that a provider could overcome the barrier by succumbing to the municipal demands does not somehow make the demands less a barrier or more lawful.

Applying Section 253(a), courts have established that certain actions or demands violate Section 253(a), ***as a matter of law***. *Auburn*, 260 F. 3d at 1177; *City of Berkeley,* 255 F. Supp. 2d at 1120; *Colonie*, 463 F. Supp. 2d at 480-81. In particular, the overwhelming weight of Section 253 cases have held that a municipal scheme that fails to identify standards governing access, and thus subjects providers to the unfettered discretion of local authorities, violates Section

---

by subsequent courts. *See, e.g., Auburn*, 260 F.3d at 1175; *Maryland Heights*, 256 F. Supp.2d at 992; *Haverford*, 1999 U.S. Dist. LEXIS 19409, *22-23.

[5] While the Fifth Circuit vacated the district courts' decisions in *Dallas* and *Austin* on the grounds that they were made moot by a subsequent state statute, which required the city to repeal

253(a), as a matter of law. *See, e.g., White Plains*, 305 F.3d at 76; *Auburn*, 260 F.3d at 1176-79;

*Colonie*, 463 F. Supp.2d at 483; *Berkeley*, 255 F. Supp.2d at 1122. Similarly, the courts have

recognized that challenged requirements need not explicitly prohibit entry. Even if local

requirements do not expressly prohibit a telecommunications service, the requirements might be

so burdensome that they effectively achieve the same result. *See, e.g., White Plains*, 305 F.3d at

76-77; *Auburn*, 260 F.3d at 1175-76; *Maryland Heights*, 256 F. Supp.2d at 992; *Prince George's

County*, 49 F. Supp.2d at 814.

> **B.     The City's Actions And The Terms And Conditions Imposed On Level 3
> Violate Section 253(a)**

The City of Prichard's actions and demands in this case clearly violate Section 253(a).

> **1.      The City's Treatment Of BellSouth Creates A Discriminatory And
> Competitively Biased Barrier To Entry**

The most blatant and direct barrier to entry imposed by the City is its disparate treatment

of BellSouth. The City's imposition of the Ordinance's terms and conditions on Level 3 violates

Section 253(a) because no such requirements are imposed on the incumbent telephone company,

BellSouth. (SMF ¶¶ 89-95). Section 253(a) is violated by municipal schemes that "materially

inhibit[] or limit[] the ability of any competitor or potential competitor to compete *in a fair and

balanced legal and regulatory environment*." *White Plains*, 305 F.3d at 76 (emphasis added);

*see also RT Communications, Inc.*, 201 F.3d at 1268-69; *Colonie*, 263 F. Supp.2d at 488-89. By

imposing the requirements of the Interim Agreement on Level 3, such as the monetary and in-

kind fees, construction obligations, and transfer limitations, but not on BellSouth, the City is

materially inhibiting or limiting the ability of Level 3 to compete with BellSouth in a fair and

balanced legal and regulatory environment. *Id.*

---

the ordinance, the district courts' widely followed reasoning remains sound and applicable. *See,
e.g., Auburn*, 260 F.3d 1176; *Haverford*, 1999 U.S. Dist. LEXIS 194909.

Level 3's primary competitor, as a new entrant into the telecommunications market, is the incumbent BellSouth. (SMF ¶ 87). Level 3 competes with BellSouth in the Mobile area, the State of Alabama, and throughout the Southeast region for the provision of telecommunications services. (SMF ¶¶ 9-11, 87). By subjecting Level 3 to the fees and other obligations of the Ordinance and Interim Agreement, while subjecting BellSouth to no regulation, the City is placing Level 3 at an inherent competitive disadvantage. *White Plains*, 305 F.3d at 79-80. Indeed, while Level 3 does not currently use its own local facilities in Prichard to provide telecommunications services within the City, it does use the facilities sharing provisions of the Telecommunications Act, 47 U.S.C. § 251, 252, to provide service to Internet Service Providers ("ISPs") in the Mobile exchange over re-sold lines of other carriers. Those ISPs' customers may be located in the City of Prichard. (SMF ¶¶ 9-10). Level 3's ability to compete is materially inhibited by the cost and operational advantage granted to BellSouth by the City. (SMF ¶ 102). Thus, the City's regulatory "scheme" violates Section 253(a).

### 2. The City's Exercise Of Unfettered Discretion Over Level 3's Ability To Provide Telecommunications Services Violated Section 253(a)

In addition to the competitive barrier, the City imposed itself as arbiter of Level 3's entry. While the courts have struck down challenged ordinance requirements that set forth some standards, but ultimately vested city officials with the discretion to deny an application, in this case it is undisputed that the City had no regulations governing the process or setting forth standards that applied to Level 3's request to construct a telecommunications network. (SMF ¶¶ 23-28, 37-39). Indeed, in this case, the City disregarded its long-standing street excavation permitting Ordinance, and forced Level 3 to comply with a whole new, *ad hoc* set of requirements. (*Id.*).

The undisputed facts in this case demonstrate that whether and when Level 3 would be permitted to construct its telecommunications network in the City, and thus provide telecommunications service, was at the unfettered discretion and mercy of City officials. (SMF ¶¶ 23-28, 37-39). This fact alone is sufficient to establish that the City's scheme and requirements violated Section 253(a), as a matter of law. *See, e.g., White Plains*, 305 F.3d at 76; *Auburn*, 260 F. 3d at 1177; *City of Berkeley*, 255 F. Supp. 2d at 1120; *Colonie*, 463 F. Supp. 2d at 480-81. Moreover, it cannot be genuinely disputed that if Level 3 had not acceded to the City's demands and accepted the terms and conditions of the Resolution and Interim Agreement, it would not have been permitted to construct its telecommunications network in the City, and thus would have been prevented from providing telecommunications services over its network. (SMF ¶¶ 49-51). As such, the City's requirements violated Section 253(a).

The fact that Level 3 accepted the terms and conditions at the time, and has been able to provide telecommunications services subject to those terms and conditions does not alter the fact that they are unlawful. As noted above, a barrier to entry need not be insurmountable to nonetheless violate Section 253(a). *See, e.g., White Plains*, 305 F.3d at 76; *RT Communications*, 201 F.3d at 1268. In so holding, the courts and the FCC have recognized that the mere fact that a provider is ultimately capable of acceded to a city's demands does not make the requirements less of a barrier or somehow lawful. That is the case here. Level 3 accepted the Interim Agreement because it had no choice. If it had not, Level 3 would have been prevented from providing telecommunications services throughout its regional network. (SMF ¶¶ 49-51). While, in theory, Level 3 could have initiated a lawsuit against the City to establish its rights before signing, that would have left Level 3 unable to provide service and obtain revenue in the

meantime. As a start-up company, Level 3 could not have afforded such a luxury, as its rights

may have been exonerated, but it may have been bankrupt in the meantime

Indeed, Level 3 signed the Interim Agreement because it understood that its right to

challenge the terms and conditions were being reserved. (SMF ¶¶ 57-58). Article 2 of the

Interim Agreement explicitly provides that "Notwithstanding the foregoing, PROVIDER does

not waive any right to insist upon the City's compliance with any standardized franchise or right-

or-way[sic] laws mandated by state or federal law." (Def. Exh. 18). The inclusion of this

provision was a key element of Level 3's willingness to accede to the City's unlawful demands.

(SMF ¶ 57).

Ultimately, the very terms of the Interim Agreement prohibit Level 3 from providing

telecommunications service in the City "without first acquiring a franchise from CITY for such

purpose." (Def. Exh. 18 Art. 10). This provision alone explicitly prohibits or has the effect of

prohibiting Level 3's ability to provide telecommunications in the City without being even

further subject to the City's unfettered discretion. As discussed above, and as explicitly

recognized in Resolution 800-99, the City has no substantive standards governing the grant of a

franchise to provide telecommunications services. (SMF ¶¶ 27-28, 37-39). Moreover, as

discussed below, the City's focus on Level 3's provision of service within the City exceeds its

authority under Section 253. The City is authorized only to manage Level 3's physical use of the

public rights-of-way, not to regulate its provision of service. Once Level 3 has constructed its

facilities in compliance with the City's lawful right-of-way management regulations, whether

and to what extent Level 3 provides service in the City is irrelevant to the City. *See Auburn*, 260

F.3d at 1178; *City of Coral Springs, 42 F. Supp. 2d at 1309* ("The City does not have the

authority to request information regarding systems, plans, or purposes of the telecommunications

facilities"). This is particularly so given the fact that BellSouth is permitted to provide

telecommunications services in the City without a franchise from the City. (SMF ¶¶ 89-95).

### C. The Terms And Conditions Imposed By The City Are Not Within The City's Authority Reserved Under Section 253(c)

After a violation of Section 253(a) has been established, the municipality may try to

establish that the challenged requirements fall within its reserved authority under Section 253(c).

*Palm Beach*, 252 F.3d at 1192. However, the scope of permitted municipal authority under

Section 253(c) is extremely narrow. *See, e.g., Auburn*, 260 F.3d at 1180.

### 1. The City's Requirements, Including The Fees, Are Not Competitively Neutral And Nondiscriminatory

While under Section 253(c) the City has some authority to "manage" the use of the public

rights-of-way, all of the City's requirements must nonetheless be competitively neutral and

nondiscriminatory. 47 U.S.C. § 253(c). The City's requirements in the Resolution and Interim

Agreement fail that test, as the City has applied them only to the new entrant, Level 3, and not its

primary competitor, the incumbent monopolist, BellSouth. (SMF ¶¶ 84-90).

Under Section 253(c), the FCC has found that local regulations that apply only to new

entrants, such as Level 3, and not to incumbent carriers like BellSouth, are "especially

troubling," and "quite likely to be neither competitively neutral nor non-discriminatory." *TCI

Cablevision of Oakland, Inc.*, 12 F.C.C.R. 21396, 21443, ¶ 108 (1997). Likewise, the

Commission has held that "disparity in the treatment in the classes of providers violates the

requirement of competitive neutrality [of Section 253(c)]." *Silver Star Tel. Co.*, 12 F.C.C.R.

15639, 15658 (1997). On appeal, the Tenth Circuit affirmed, rejecting an argument that the

challenged regulation was "competitively neutral" because it treated all new entrants the same.

*RT Communications,* 201 F.3d at 1268-69. In *White Plains*, the Court held that "a municipality

may not, as White Plains sought to do, impose a host of compensatory provisions on one service

15

provider without placing any on another." *White Plains*, 305 F.3d at 80; *see also Colonie*, 263 F. Supp.2d at 488-89.

As discussed above, it is undisputed in this case that the requirements imposed on Level 3 as a condition of constructing its telecommunications network are not imposed on BellSouth. (SMF ¶¶ 89-95). Indeed, the City appears to impose no regulatory control over BellSouth's use of the public rights-of-way, whatsoever. For example, BellSouth constructs utility poles in the public rights-of-way without any permission from or notice to the City. (SMF ¶¶ 96-99). Indeed, the City does not even know how many poles BellSouth has installed or where they are located. (SMF ¶ 97). This lack of oversight is despite the fact that BellSouth's use of the public rights-of-way is both more extensive and burdensome. (SMF ¶¶ 100-101). All of the requirements imposed on Level 3 in the Resolution and Interim Agreement, therefore, are not competitively neutral and nondiscriminatory, and thus are not within the City's authority to enforce under Section 253(c).

### 2. The Fees And In-kind Compensation Requirements Are Not Fair And Reasonable, And Were Not Publicly Disclosed

Under Section 253(c), the City is permitted to recover "fair and reasonable compensation," but only if the fee was publicly disclosed (and as discussed above, competitively neutral and nondiscriminatory). 47 U.S.C. § 253(c). Regardless of the amount of the fee imposed by the City in this case, the fees fail to fall within the City's authority because they were not publicly disclosed as required by Section 253(c). (SMF ¶¶ 63, 81). That fact alone is sufficient to preempt the City's enforcement of the fees and in-kind compensation imposed on Level 3. *Haverford*, 1999 US Dist. LEXIS 19409 at *22-23; *see also City of Mobile*, 171 F. Supp. 2d at 1277 (fees lawful under § 253 because publicly disclosed in schedule).

16

Even if they had been properly publicized, the fees and in-kind compensation requirements imposed by the City exceed the City's authority under Section 253(c). Section 253(c) permits municipalities to charge only fees that recover their costs incurred in managing the public rights-of-way. *See, e.g., Auburn*, 260 F.3d at 1176; *Maryland Heights*, 256 F. Supp. 2d at 994; *City of Mobile*, 171 F. Supp. 2d at 1277 (fees lawful because "calculated to compensate Mobile for the costs of administering and enforcing the ordinance"); *Prince George's County*, 49 F. Supp. 2d at 817-19. Similarly, in-kind compensation requirements also exceed local authority under Section 253(c). *See Auburn*, 260 F.3d at 1179 ("requirements that companies provide free or excess capacity for the use of cities or other users go beyond management of rights of way").

In striking down a municipal telecommunications ordinance, and the $1.74 per foot fee imposed therein, the court in *Maryland Heights* held that a "fee charged by a municipality must be directly related to the actual costs incurred by the municipality when a telecommunications provider makes use of the rights-of-way."[6] 256 F. Supp. 2d at 994. The court stated that it was "persuaded by the legislative history of the FTA [Federal Telecommunications Act], as outlined in *Bell Atlantic-Maryland*, 49 F.Supp.2d at 817 n. 26, as well as the de-regulation concept in the FTA as a whole, since plainly a fee that does more than make a municipality whole is not compensatory in the literal sense, and instead risks becoming an economic barrier to entry." *Id.* The court further explained that the legislative history supported the conclusion, noting that "in the only Congressional floor argument to address the cost provisions of the FTA, Senator Diane Feinstein explained that telecommunications companies should only be required to pay their

---

[6] *See also Lightwave Technologies, LLC v. Escambia County*, 804 So. 2d 176 (Ala. 2001) (holding that $1 per foot annual fee exceeds city's costs).

share of fees to enable local governments to recover the increased street repair and paving costs
that result from repeated excavations of the rights-of-way." *Id.* (citing *In re Classic Telephone,
Inc.,* 11 F.C.C.R. 13,082 (FCC 1996)); *see also* 141 Cong.Rec. S8172 (daily ed. June 12, 1995)).

The fees and in-kind compensation requirements imposed by the City are not permitted
under Section 253(c). Obviously, the 4 strands of fiber optic cable, and Optical Splice Boxes
required by Article 9.4 for the City's use, which have significant retail value, are wholly
unrelated to the City's costs, or its management of the public rights-of-way. *Auburn*, 260 F.3d at
1179. In addition, the City admits that the monetary fees imposed are unrelated to, and far
exceed, the City's costs of managing Level 3's use of the public rights-of-way. (SMF ¶¶ 65-
67).[7] Thus, the annual fee totaling over $90,000 clearly exceeds the City's costs and is a
windfall profit.

The Second Circuit has recognized that one purpose of Section 253(c) is to prevent
municipalities from abusing their monopoly control over an essential input of
telecommunications construction and operations – access to the public rights-of-way. *White
Plains*, 305 F.3d at 79. The City's use of its leverage in this case demonstrate that the Second
Circuit was correct to be concerned. (SMF ¶¶ 51, 82).

Ultimately, the fact that the compensation requirements imposed on Level 3 are not fair
and reasonable is established by the fact that the City does not impose any such compensation
requirement on BellSouth, despite the fact that BellSouth occupies many more miles of right-of-
way than Level 3. *White Plains*, 305 F.3d at 79-80.

---

[7] If there had been any doubt, the facts demonstrate that the City has never calculated its costs.
(SMF ¶ 68). The Resolution itself states that the fee is to "reimburse the City for its costs *and
provide compensation for occupancy and use of the rights-of-way*. . . ." (Def. Exh. 19 p.2
(emphasis added). Further, other provisions of the Interim Agreement require Level 3 to cover
any actual costs incurred by the City. (Def. Exh. 18 §§ 1.9, 1.12, 4.1, 8, 7).

**3.     The City's Requirements Are Not Limited To Management Of The Public Rights-Of-Way**

Even if competitively neutral and nondiscriminatory, the City's requirements must still be within its right-of-way management authority.  Section 253(c) reserves to the City only authority to "manage" the public rights-of-way.  The scope of municipal "management" authority is limited to time, place, and manner regulation of matters involving the physical occupation of the public rights-of-way.  "[T]he question is whether the regulations are designed to 'manage the public rights-of-way,' as permitted by § 253(c), or impermissibly go further." *White Plains*, 305 F.3d at 81.  A requirement is not related to management of the rights-of-way simply because the telecommunications provider has facilities in the rights-of-way. *Auburn*, 260 F.3d at 1178-80. They must be related to the management of the narrow issue of matters having a physical impact on the public rights-of-way. *Id.* at 1177.  Each of the following non-fee requirements imposed by the City fail to satisfy this test, and must be preempted as a matter of law.

Prohibition on Services: Article 10 of the Interim Agreement explicitly prohibits Level 3 from providing telecommunications services within the City without first acquiring a "franchise" from the City for such purpose.  (Def. Exh. 18, Art. 10).  Clearly, once Level 3's facilities have been installed in compliance with any legitimate rights-of-way management regulations regarding the physical construction, whether and to what extent Level 3 provides services is beyond the City's authority. *See Auburn*, 260 F.3d at 1178.

Discretionary Grant Of Consent:  As discussed above, the City's regulatory "scheme" grants the City precisely the sort of discretion to prohibit telecommunications that Section 253 preempts, and must be invalidated.

Transfer Of Ownership: In Article 3 of the Interim Agreement, the City prohibits Level 3 from transferring the Agreement or the rights granted therein, nor lease or sublet all or

19

substantially all of its Facilities without the prior written consent of the City. Article 3 sets forth no criteria by which such a request for transfer will be judged. Such oversight of the ownership of Level 3 is unrelated to legitimate rights-of-way management, and exceeds the City's authority under Section 253(c). *White Plains*, 305 F.3d at 82.

### 4. *BellSouth v. City of Mobile* Supports Level 3's Claims

While the City of Prichard will likely assert that this Court's decision in *BellSouth Telecommunications, Inc. v. City of Mobile*, 171 F. Supp. 2d 1261 (S.D. Ala. 2001), supports the City's actions, the current case is distinguishable from the facts addressed in *City of Mobile*. Indeed, *City of Mobile* ultimately supports Level 3's claims.

In *City of Mobile*, BellSouth challenged the City's construction "permit" requirements. Level 3 sought and was willing to obtain standard construction permits. (SMF ¶¶ 22-30). Indeed, Prichard has a separate construction permitting standards and requirements in its street excavation Ordinance. (Def. Exh. 10). Level 3 does not here challenge those permitting standards. Rather, Level 3's challenge is to the City's biased imposition of entry requirements beyond permits based on the unfettered discretion of the City.

Moreover, Prichard does not subject BellSouth to the same requirements as Level 3, including but not limited to the annual fees imposed on Level 3. (SMF ¶¶ 89-95). The court in *City of Mobile*, repeatedly noted that the challenged provisions were lawful in part because they were uniformly applied. 171 F. Supp.2d at 1270. While Prichard's Resolution No. 800-99 speaks of "uniform standards," the undisputed facts demonstrate that the City has not applied the requirements uniformly. (SMF ¶¶ 89-95).

Finally, as noted above, in *City of Mobile*, the court upheld the City's fee on the grounds that it was designed to recover the City's costs. *Id.* at 1270 (fee "imposed by the Ordinance is . . . directly related to the actual use of the City's rights-of-way"). Here, by contrast, the City of

Prichard clearly is not claiming that the fee was designed to recover the City's costs. Rather, Resolution No. 800-99 states that the purpose of the fee was to "reimburse the City for its costs *and provide compensation for occupancy and use of the rights-of-way. . . .*" (Emphasis added). Moreover, the Resolution recognizes that the City had not calculated its costs. (Def. Exh. 19 ¶ 3 (directing Mayor to undertake study of costs)). Thus, the Prichard fee did not purport to be and could not have been based on the City's costs. (SMF ¶ 65).

As a result, *City of Mobile* supports summary judgment in Level 3's favor in this case, as it illustrates the types of limited, *lawful* rights-of-way management regulations and cost-based fees that were not used by the City of Prichard.

The foregoing demonstrate that the City's requirements had the effect of prohibiting the ability of Level 3 to provide telecommunications services in violation of Section 253(a), and were not within the City's limited authority under Section 253(c). Accordingly, Level 3 is entitled to summary judgment on Count I of its Counterclaims, and on its Second, Fifth, and Seventh affirmative defenses to the City's Complaint.

## V.    THE FEES IMPOSED ON LEVEL 3 ARE AN UNLAWFUL TAX

In the alternative,[8] Level 3 is entitled to summary judgment on Count II of its Counterclaims, and its Sixth and Seventh affirmative defenses to the City's Complaint, on the

---

[8] The Court need not reach this issue in the event that it holds the City's requirements unlawful under federal law. The Supreme Court has repeatedly made clear that the question of whether a federal statute preempts a state or local law does not involve a constitutional determination that the court should avoid under the rule of *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936). For example, in *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 271-72 (1977), the court explained that when a court determines whether a state law is preempted by a federal statute, "[al]though the claim is basically constitutional in nature, deriving its force from the operation of the Supremacy Clause, Article VI, cl. 2, it is treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." Similarly, the Court has made clear that although a finding that a local law is subject to explicit statutory preemption is grounded in the Supremacy Clause, "[t]he basic question involved . . .is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift*

grounds that the fees sought to be enforced by the City are unlawful taxes.[9]  Under Alabama law, the City's authority to impose taxes is limited to that authority which it has been specifically granted. *See, e.g., City of Mobile v. GSF Properties, Inc.*, 531 So. 2d 833, 836 (Ala. 1988) ("A municipal corporation's power to collect license taxes is derived solely from the state. Municipalities have no inherent power of taxation, although the state may confer upon municipalities the power to tax."); *Ala. Farm Bureau Mutual Casualty Ins. Co. v. City of Hartselle*, 460 So. 2d 1219, 1222 (Ala. 1984).

The only authority specifically granted to the City to impose taxes on telecommunications providers is in Alabama Code § 11-51-128(a).  Specifically, Section 11-51-128(a), fixes "the maximum amount of privilege or license tax which the several municipalities within this state may annually assess and collect of persons operating telephone exchanges and long distance telephone lines in this state . . ." depending on the population of the municipality. Level 3 is operating both long distance telephone lines and local exchanges in the State using the lines that pass through the City of Prichard.  (SMF ¶¶ 5-13).  Prichard's population, according to the 2000 census data, is 28,903.  (U.S. Census Fact Sheet for the City of Prichard, Alabama, *available at* www.factfinder.census.gov).    Thus, the maximum the City can impose on Level 3 is $1,650 (assuming a local exchange license is appropriate). Ala. Code § 11-51-128(a)(22).

---

& Co. v. Wickham*, 382 U.S. 111, 120 (1965).  Accordingly, this Court need not look first, or at all, at the state law issues. *But see Palm Beach*, 252 F.3d at 1176.  In any event, resolution of the state law issue will resolve only the treatment of the fee as an unlawful tax, but will not resolve Level 3's challenge to the City's actions and requirements as a whole under Section 253.

[9] For the reasons identified in Level 3's opposition to the City's Motion For Partial Summary Judgment on Count II of Level 3's Counterclaims, the Tax Injunction Act does not apply in this case to divest the Court of jurisdiction to act on Level 3's defensive responses to the City's attempted enforcement of the taxes.

The City has adopted a business license tax on telecommunications providers pursuant to Alabama Code § 11-51-128. (SMF ¶ 29). Yet, the City has subject and seeks to enforce on Level 3 significantly more than permitted by law or under its own license tax ordinance. The annual monetary compensation required of Level 3 by the City alone exceeds $90,000. (SMF ¶ 73). Moreover, because the compensation imposed by the City exceeds its costs, was intended to obtain "rent" from Level 3, and has been placed in the City's General Fund without separate accounting (thus allowing it to be used for any purpose), the compensation requirements are taxes in excess of the City's lawful authority.

The Supreme Court of Alabama has recently clarified the authority of local governments to impose fees on telecommunications providers. In *Lightwave Technologies, LLC v. Escambia County*, 804 So. 2d 176 (Ala. 2001), the court addressed a challenge to a $1 per linear foot annual "fee" imposed on Lightwave Technologies, a provider of interexchange telecommunications services (in lay terms, long distance services). The court held the charge to be an unlawful tax. The elements that the court used to distinguish a permissible administrative "fee" from an unlawful "tax" were (1) that the County also imposed a bond requirement, (2) that the purpose of the charge was to generate revenue, (3) that the amount of the charge was not rationally related to the County's expected costs of repairing the right-of-way, and (4) that the money was not reserved in a fund for right-of-way management use. 804 So.2d at 179-80.

The City of Prichard's compensation impositions on Level 3 fall squarely within the elements of a tax identified in *Lightwave*. First, the City readily admits that the payments required by the Interim Agreement are unrelated to and not limited to its costs of managing Level 3's construction. (SMF ¶ 65) Moreover, the Interim Agreement contains provisions assuring that the City's costs were covered by Level 3. (Def. Exh. 10 Arts. 1.9, 1.12, 7, 8). Second, the

23

City has never attempted to calculate its costs of managing Level 3's use of the public rights-of-way. (SMF ¶ 68). Indeed, the City has not calculated its costs, if any, incurred as a result of Level 3's project since construction was completed in late 1999. (SMF ¶ 68). As such, it is undisputed that the monetary compensation requirements cannot be demonstrated to be even a fair approximation of the City's costs.

Third, the City admits that its goal in imposing the annual charge on Level 3 was to generate revenue for the City. (SMF ¶¶ 36, 74). Indeed, the money received from Level 3 has gone to pay for wholly unrelated matters. (SMF ¶¶ 75-79). For example, in Resolution No. 803-99, the City appropriated $21,000 annually from the money received from Level 3 for payment of garbage collection costs. (Def. Exh. 23). Accordingly, the revenue received from Level 3 has gone to general use by the City. Thus, the "fee" imposed in the Interim Agreement is actually a tax, and therefore exceeds the maximum tax permitted under Ala. Code § 11-51-128(a)(22).

Finally, even if the City were authorized to impose the tax generally, it is unlawful for it to enforce it in this case because the application is discriminatory. The Alabama Supreme Court has ruled that "license taxes must bear equally and uniformly upon all persons engaged in the same class of business or occupation or exercising the same privileges." *Rochelle v. Florence*, 188 So. 247, 249 (Ala. 1939). As explained above, the tax the City seeks to enforce on Level 3 is not imposed on BellSouth, an entity engaged in the telecommunications business (like Level 3), and which exercises the privilege of occupying the City's rights-of-ways (like Level 3). (SMF ¶¶ 86-102). As such, it is evident that the City's tax is not imposed equally and uniformly upon BellSouth and Level 3, entities that are engaged in the same class of business and exercising the same privileges. Because the City is imposing the Interim Agreement's tax upon Level 3 but not upon BellSouth, the City's actions are discriminatory, inequitable and unlawful.

24

*See Henry v. Shevinsky*, 239 Ala. 293, 295 (Ala. 1940)(citing *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495 (1937); *Exchange Drug Co. v. State Tax Comm.*, 218 Ala. 115 (1928)).

It is clear from the foregoing, that the annual per linear foot charge and in-kind obligation imposed on Level 3 is a tax in excess of the City's authority under both Alabama Code Section 11-51-128 and the Alabama Supreme Court's decision in *Lightwave*. Accordingly, Level 3 is entitled to summary judgment on Count II of its Counterclaims and its Sixth and Seventh affirmative defenses to the City's Complaint.

## VI. THE CITY HAS BREACHED THE INTERIM AGREEMENT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING

To the extent that the Interim Agreement is lawful, the City is not entitled to enforce its terms as the City has breached the agreement and the covenant of good faith and fair dealing.

### A. The City Has Breached The Interim Agreement

Under Alabama law, a breach of contract occurs where it is shown that: (1) there exists a valid contract binding upon the parties; (2) the plaintiff (or counterclaimant) has performed under the contract; (3) the defendant (or counterclaim-defendant) has not performed under the contract; and (4) damages result. *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 673 (Ala. 2001). In this case, the City has breached its obligations under the Interim Agreement, and Level 3 is entitled to summary judgment on Count III of its Counterclaims and defenses to the City's Complaint.

The Interim Agreement between the City and Level 3 expressly incorporated by reference the terms of Resolution 800-99. (Def. Exh.18 Art. 12.1). Resolution 800-99, in turn, provides, *inter alia*, that the City needs to establish a new regulatory resolution that will provide uniform standards and requirements applicable to all users of city right-of-way. (Def. Exh. 19, pp. 3-4). In order to bring this about, under Resolution 800-99, the Mayor is directed to undertake "a study

25

and plan of rights-of-way use, costs and valuation and develop a recommended rights-of-way regulatory resolution for consideration by the City . . . on or before January 31, 2000." (Def. Exh. 19, p. 4). Accordingly, under the Interim Agreement, the Mayor's office was to produce a study and plan of rights-of-way use, costs and valuation and develop a regulatory resolution for consideration by the City, on or before January 31, 2000. (*Id*. at 4). Under Resolution No. 800-99, the City was also supposed to impose the requirements on all telecommunications providers in a uniform manner. (*Id*.).

The City's taking of the actions required by the Resolution were material conditions of Level 3's agreement to the supposedly *interim* agreement. (SMF ¶¶ 52-56). Indeed, the Interim Agreement states that Level 3 understands that the City is currently in the process of developing a comprehensive regulatory resolution governing the use of its rights-of-way. (Def. Exh.18, Art.1.5).

The City has not complied with the material terms of the Interim Agreement. First, the City has not undertaken a study of the costs of managing the public rights-of-way. (SMF ¶ 104). Second, the City has not adopted a new regulatory resolution that will provide uniform standards and requirements applicable to all users of the City's rights-of-way. (SMF ¶ 103). Third, the City has also failed to reform the annual fee requirements in the Interim Agreement in a manner consistent with federal and state law, so that such fees would be tailored to the City's direct costs of managing the rights-of-way. Finally, the City has not enforced the terms of the Resolution and Interim Agreement in a uniform manner. (SMF ¶¶ 90-95). Accordingly, the City has breached material terms of the Interim Agreement between Level 3 and the City.

Level 3 has been injured by the City's failure to abide by the terms of the Interim

Agreement.[10]  Because the City has failed to undertake a rights-of-way management cost study,

Level 3 has been forced to pay unlawful and unreasonable fees, and provide unlawful and

unauthorized in-kind payments to the City.  Because the City has failed to adopt and enforce a

uniform regulatory resolution, Level 3 has been forced to continue to operate under the terms of

the Interim Agreement while its primary competitor, BellSouth, has not been required to operate

under similar conditions, thus placing Level 3 at a competitive disadvantage.  (SMF ¶¶ 86-102).

Accordingly, Level 3 is entitled to summary judgment on Count III of its Counterclaims

and its Third and Fourth affirmative defenses to the City's Complaint.

## B.      The City Has Breached The Covenant Of Good Faith And Fair Dealing

Under Alabama law, all contracts are subject to the implied covenant of good faith and

fair dealing.  *Hoffman-La Roche v. Campbell*, 512 So.2d 725, 738 (Ala. 1987).  "This obligation

is described in CORBIN ON CONTRACTS, § 654A, as simply 'the obligation to preserve the spirit of

the bargain rather than the form,' and that 'it is moreover a group of specific rules which evolved

to insure that the basic purpose of contract law is carried out, *the protection of reasonable*

*expectations of parties induced by promise*.'"  *Id.* (noting that a majority of jurisdictions

recognize this obligation) (emphasis added).  As the Alabama Supreme Court has explained,

"this principle of justice forbids attempts by the actor to get more for himself than the other party

reasonably contemplated giving him at the time the contractual relationship was entered into,

absent good cause."  *Hoffman-La Roche*, 512 So.2d at 738 (quoting CORBIN ON CONTRACTS, §

654E(A).

As discussed above, the express terms of the Interim Agreement and Resolution 800-99

(which is incorporated in the Interim Agreement by reference) provide that the City was required

---

[10] Level 3 has complied with the Interim Agreement, installing the required dark fiber and paying
the required fees each year until seeking to settle with the City in later 2002. (Def. Exh. 1).

to: (1) undertake a cost study to determine the actual costs of managing the public rights-of-way; (2) develop a permanent regulatory resolution incorporating the results of such cost study and implementing the requirements of federal law; and (3) establish and apply the terms of a permanent Telecommunications Resolution to all providers of telecommunications in the City. Level 3 agreed to enter into the Interim Agreement with the City based, in part, on its reasonable belief and expectation that the City would satisfy these contractual obligations. (SMF ¶¶ 52-56). Thus, these were essential elements of the City's compliance with the terms of the Interim Agreement, and material to Level 3's good faith expectations and bases for entering what was to be an *interim* agreement.

The City has failed to undertake any of the required actions however, and has therefore failed to carry out the necessary actions to fulfill a key underlying purpose of the Interim Agreement. Because the City has failed to undertake action wholly within its control to fulfill the terms of the contract, Level 3's justified and reasonable expectations that the City would satisfy its contractual obligations under the Interim Agreement were therefore denied, and the City has breached its duty of good faith and fair dealing owed to Level 3. *Hoffman-La Roche v. Campbell*, 512 So.2d at 739.

Level 3 has been harmed and has suffered damage as a result of the City's breach of the covenant of good faith and fair dealing. Because the City has failed to undertake a rights-of-way management cost study, Level 3 has been forced to pay unlawful and unreasonable fees, and provide unlawful and unauthorized in-kind payments to the City. Because the City has failed to adopt and enforce a uniform regulatory resolution, Level 3 has been forced to continue to operate under the terms of the Interim Agreement while its primary competitor, BellSouth, has not been required to operate under similar conditions, thus placing Level 3 at a competitive disadvantage. (SMF ¶¶ 86-102).

Accordingly, Level 3 is entitled to summary judgment on Count IV of its Counterclaims and its defenses to the City's Complaint.

## VII.    THE CITY'S ACTIONS VIOLATED LEVEL 3'S FEDERAL RIGHTS CREATING LIABILITY UNDER SECTION 1983

The Court's determination of liability under 42 U.S.C. § 1983 requires a two-step analysis. First, the City must have acted under color of law when it violated Level 3's federal statutory rights. Second, the City's acts must have violated some right, privilege or immunity protected by the Constitution or laws of the United States. *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir. 1985); *Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002); *Blessing v. Freestone,* 520 U.S. 329, 340 (1997). When Section 1983 liability attaches to a municipality, the Court must also determine whether or not the municipality acted pursuant to an "official municipal policy." *Monell v. Department of Social Serv. of N.Y.,* 436 U.S. 658, 691 (1978). However, the municipality need not expressly adopt an "official municipal policy" to be liable under Section 1983. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003). Any federal injury arising from "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," gives rise to such liability. *Monell*, 436 U.S. at 694.

The City of Prichard, and the members of the City staff, clearly acted under color of law when they engaged in the actions described above that denied Level 3 the right to access the public rights-of-way and provide telecommunications services. As demonstrated above, the City's actions also violated Level 3's right to access the public rights-of-way and provide telecommunications services under Section 253. Finally, the actions and edicts of the City's staff and the requirements of Resolution 800-99 clearly had the force and effect of official policy, as the City Council would not permit Level 3 to proceed without its approval.

Accordingly, Level 3 respectfully requests that the Court grant it summary judgment on Count V of its Counterclaims, and set a trial date for the determination of damages, and that the

29

Court direct Level 3 to submit to the Court an Application for an Award of Costs and Attorneys' Fees.

## VIII.   CONCLUSION

Based on the foregoing, Level 3 respectfully submits that it is entitled to summary judgment on all Counts of its Counterclaims, and on its Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, and Tenth Affirmative Defenses to the City's Complaint.

Respectfully submitted,

H. William Wasden (WASDW4267)
W. Perry Hall (HALLW9043)
BOWRON, LATTA & WASDEN, P.C.
Post Office Box 16046
Mobile, Alabama 36616
Telephone:     251-344-5151
Facsimile:      251-344-9696

T. Scott Thompson
K.C. Halm
Cole, Raywid & Braverman, LLP
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC  20006
202-659-9750
202-452-0067 (fax)

**Attorneys for Level 3 Communications, LLC**

January 14, 2004

30

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 14th day of January, 2004, served a copy of Level 3 Communications, LLC's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment by Hand Delivery to the following counsel of record:

Arthur J. Madden, III, Esquire
MADDEN & SOTO
465 Dauphin Street
Mobile, Alabama 36602

_____
COUNSEL