**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE CITY OF PRICHARD, ALABAMA,** | ) | |
| | ) | FILED JAN 14 '04 PM 3 52 USDCALS |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 03-248-P-C** |
| | ) | |
| **LEVEL 3 COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Plaintiff.** | ) | |

**SUGGESTED DETERMINATIONS OF
UNDISPUTED FACTS AND CONCLUSIONS OF LAW**

Pursuant to Local Rule 7.2, Defendant/Counterclaim Plaintiff Level 3

Communications, LLC ("Level 3"), in connection with the filing of its Motion for

Summary Judgment on all counts, submits the following suggested Determinations of

Undisputed Facts and Conclusions of Law.

Respectfully submitted,

H. William Wasden (WASDW4267)
W. Perry Hall (HALLW9043)
BOWRON, LATTA & WASDEN, P.C.
Post Office Box 16046
Mobile, Alabama 36616
Telephone:    251-344-5151
Facsimile:    251-344-9696

T. Scott Thompson
K.C. Halm
Cole, Raywid & Braverman, LLP
1919 Pennsylvania Avenue, NW
Suite 200
Washington, DC  20006
202-659-9750
202-452-0067 (fax)

**Attorneys for Level 3 Communications, LLC**

January 14, 2004

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 14th day of January, 2004, served a copy of Suggested Determinations of Undisputed Facts and Conclusions of Law by Hand Delivery to the following counsel of record:

Arthur J. Madden, III, Esquire
MADDEN & SOTO
465 Dauphin Street
Mobile, Alabama 36602

_____
COUNSEL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE CITY OF PRICHARD, ALABAMA,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 03-248-P-C** |
| | ) | |
| **LEVEL 3 COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Defendant/Counterclaim Plaintiff.** | ) | |

**DETERMINATIONS OF UNDISPUTED FACT AND CONCLUSIONS OF LAW**
**PERTAINING TO DEFENDANT/COUNTERCLAIM PLAINTIFF LEVEL 3'S**
**MOTION FOR SUMMARY JUDGMENT ON ITS COUNTERCLAIMS**

This matter comes before the Court, pursuant to Rule 56 of the Federal Rules of Civil

Procedure, upon the motion for summary judgment, with supporting brief, of

Defendant/Counterclaim Plaintiff Level 3 Communications, LLC ("Level 3"), which was filed

on January 14, 2004, 2004.  The Court, having heard the arguments of counsel for the

defendant/counterclaim plaintiff and plaintiff/counterclaim defendant on _____, 2004,

having reviewed the briefs with exhibits submitted by the parties and having considered all of the

same, makes the following determinations of undisputed facts and conclusions of law.

**I.      FINDINGS OF UNDISPUTED FACTS**

1.      Level 3 is a limited liability company organized under the laws of the State of Delaware,

      whose principle place of business is 1025 Eldorado Boulevard, Broomfield, Colorado,

      80021.

2.   Level 3 is a telecommunications company with a nationwide fiber optic telecommunications network.

3.   The Alabama Public Service Commission found that it was in the public interest to authorize Level 3 to provide telecommunications services, including Telephone Toll Service and Local Exchange Service, in Alabama pursuant to a Certificate of Public Convenience and Necessity ("CPCN").

4.   Level 3's CPCN was granted on February 2, 1999.

5.   Level 3 provides telecommunications services in the State of Alabama.

6.   Level 3 offers certain telecommunications services in Alabama pursuant to tariffs filed with and approved by the Alabama Public Service Commission.

7.   Under its Switched Access tariff filed with the Alabama Public Service Commission, Level 3 offers Carrier Common Line Service and Switched Access Service.

8.   Under its Access Service tariff filed with the Alabama Public Service Commission, Level 3 offers Dedicated Access Service and Direct Inward Dial services.

9.   Level 3 provides Direct Inward Dial services to Internet Service Providers ("ISPs") in the State of Alabama, including to ISPs in the Mobile exchange area.

10.  Level 3's ISP customers in the Mobile exchange may use Level 3's service to serve customers located in the City of Prichard.

11.  Level 3 competes with BellSouth in the provision of these services to ISPs.

12.  Under its Interexchange tariff filed with the Alabama Public Service Commission, Level 3 offers interexchange services.

13.  Level 3 also offers and provides unregulated services within Alabama.

175589_1.DOC

14. Level 3 provides its telecommunications services via a regional and national network, a portion of which passes through the City of Prichard, Alabama ("City").

15. In order to offer and provide its telecommunications services, in 1999 and 2000, Level 3 constructed its network.

16. Level 3's network is a self-healing, redundant ring architecture.

17. Plaintiff City of Prichard is an Alabama Municipality.

18. In October of 1999, the City filed for bankruptcy pursuant to Chapter 9 of the Bankruptcy Code.

    **A.      Level 3's Request to Construct in the Public Rights-of-Way**

19. To complete a portion of its telecommunications network from New Orleans to Tallahassee, Level 3 chose to construct facilities in the City of Prichard.

20. Level 3 must have access to or cross public rights-of-way in order to construct its facilities.

21. Level 3, through its agent, Cross Country Land Services, first contacted the City of Prichard in July 1999 regarding obtaining permits for access to public rights-of-way within the City.

22. When Level 3 initially contacted the City, the City had in place Ordinance No. 1736, which governed the issuance of permits for excavation of public rights-of-way for installation of utility-type facilities.

23. Ordinance No. 1736, was adopted in 1991.

24. Ordinance No. 1736 contains provisions, among others, requiring persons doing construction in the public rights-of-way to have insurance, post bonds, indemnify the City, repair disturbed areas, and reimburse the City for its costs incurred.

175589_1.DOC

3

25.  Ordinance No. 1736 does not require that as a condition of obtaining a permit that the applicant have a franchise, license, or any other similar authorizing agreement from the City.

26.  Other than Ordinance No. 1736, when Level 3 initially contacted the City, the City had no Resolution, Ordinance, regulations, or other official enactment identifying the standards, processes, or requirements applicable to a request by a telecommunications provider to construct a telecommunications network in public rights-of-way in the City.

27.  Mr. Ellis Bea was the City's Rule 30(b)(6) designee regarding the City's Ordinances, Resolutions, Laws, regulations, or similar official requirements governing the construction of Facilities in the public rights-of-way between January 1, 1999 and the present.

28.  The City has imposed a business license tax on providers of telecommunications services.

29.  In response to Level 3's request for access, the City did not allow Level 3 to obtain permits pursuant to Ordinance No. 1736, but rather, asserted that Level 3 would be required to obtain the consent of the City Council before the City would grant Level 3 access to the City streets and public rights-of-way.

30.  After being informed that City Council approval would be required, Level 3's agent submitted a request to be placed on the City Council agenda, and pursuant to that request, presented Level 3's request to the City Council at its meeting on July 13, 1999.

31.  Level 3's request was not approved or acted upon by the City Council at its July 13, 1999 meeting.

32.     Rather, Level 3's representatives were required to seek additional meetings with City
        representatives, including but not limited to the City Council and the Attorney for the
        City Council.

33.     During meetings with the City Council and its attorney, it was made clear to Level 3's
        representatives that Level 3 would not be permitted to construct its telecommunications
        network unless Level 3 entered into an agreement with the City and agreed to pay the
        City annual fees and in-kind compensation.

34.     While Level 3's representatives offered to provide the City compensation at a level likely
        to be related to the City's costs incurred in managing Level 3's use of the public rights-
        of-way, the City's representatives made clear that such a payment amount would not be
        sufficient for the City to permit Level 3 to construct its facilities.

35.     Then-Mayor, Jesse Norwood, confirmed in his deposition that the City Council was only
        interested in the immediate revenue that Level 3 would pay, and that the City Council
        would not have permitted Level 3 to install its telecommunications network if Level 3
        had not agreed to pay an amount considered sufficient by the City Council.

36.     The terms and conditions of Level 3's access to the public rights-of-way, including but
        not limited to the amount of fee that would be imposed, were not identified in any City
        Ordinance, Resolution, or other official City enactment. Rather, they would be
        determined based on the discretion of the City after Level 3's request for access.

37.     As the Director of the City's Inspection Division, and the City's Rule 30(b)(6) designee
        regarding the City's laws governing construction of facilities in the public rights-of-way,
        Mr. Ellis Bea, testified in deposition for this case, there were "no rules" governing the
        City's consideration of Level 3's application.

5

38.     Similarly, Ronnie Williams, the Attorney for the City Council at the time, explained in
        deposition "I said there was a discussion about the city could say no; that this is not
        something the city had to accept."

        **B.     Resolution No. 800-99**

39.     After Level 3's request to construct, on November 16, 1999, the City adopted Resolution
        No. 800-99.

40.     In Resolution 800-99, the City expressly recognized the City's need to develop a
        permanent, comprehensive ordinance to address the use of the City's public rights-of-way
        by telecommunications providers.

41.     Specifically, Resolution 800-99 states that it is the City's "intent to develop and
        administer the use of rights-of-way pursuant to a regulatory resolution that will provide
        uniform standards applicable to all users [of the public rights-of-way]."

42.     The Resolution also expressed the City's view that it is "essential that a plan and study of
        rights-of-way use, costs for such use, and valuation of occupancy be undertaken by the
        City to form the basis" for the permanent regulatory resolution that the City would adopt.

43.     Resolution 800-99 also establishes that a standard interim use agreement is to be used by
        the City with respect to all telecommunications carriers.

44.     The interim use agreement was, therefore, purported to serve as the uniform agreement to
        be used with all telecommunications providers occupying the City's rights-of-way,
        presumably until a cost study was prepared and a permanent license agreement and
        ordinance was adopted by the City.

45.     Finally, the Resolution also directed the Mayor to undertake a study and plan of rights-of-
        way use, costs and valuation, and to develop a right-of-way regulatory resolution,

                                                6

incorporating such study, "for consideration by the City . . . on or before January 31, 2000."

## C.   Level 3 Is Required To Accept The Interim Agreement As A Condition Of Constructing Its Telecommunications Network

46.   Two weeks after the City enacted Resolution 800-99, the City Council adopted and the Mayor signed, an "Interim Rights-Of-Way Use Agreement" ("Interim Agreement") between Level 3 and the City.

47.   On December 30, 1999, Level 3 executed the Interim Agreement.

48.   Level 3 was required to accept the terms of the Interim Agreement as a condition of being permitted to construct its facilities in the public rights-of-way.

49.   If Level 3 had not accepted the terms and conditions imposed by the City in the Interim Agreement, it would not have been permitted to construct its facilities in the City, and thus would not have been able to provide telecommunications services over its network.

50.   When asked whether the City had some leverage to extract a larger payment from Level 3, Ronnie Williams, who was at the time Attorney to the City Council, answered in deposition "Well, if the city wanted to say no. And I think that came up a couple of times."

51.   Level 3 accepted the terms of the Interim Agreement based, in part, on the representations made by the City in the Interim Agreement and in Resolution 800-99.

52.   Specifically, Level 3 relied upon the fact that the Interim Agreement acknowledged that the City was at that time developing, pursuant to Resolution 800-99, and the Telecommunications Act of 1996, 47 U.S.C. § 151, *et seq.*, a permanent regulatory resolution and ordinance to govern the use of the City's rights-of-way by telecommunications providers.

7

53. The Interim Agreement incorporated by reference the terms of Resolution 800-99.

54. In addition, Level 3 relied on the City's representations in Resolution 800-99 (which was incorporated by reference in to the Interim Agreement), that the City was to: (1) undertake a cost study to determine the actual costs of managing the public rights-of-way; (2) develop a permanent regulatory resolution incorporating the results of such cost study and implementing the requirements of federal law; and (3) establish and apply the terms of the permanent regulatory resolution to all telecommunications providers with facilities occupying the City's rights-of-way.

55. Moreover, Level 3 relied on the representation of the City in Resolution 800-99 that the terms of the Resolution and the model Interim Agreement were to be uniformly imposed on all providers of telecommunications services who occupied public rights-of-way in the City.

56. In addition, Level 3 also declined to waive any rights reserved under Alabama law or the Telecommunications Act of 1996, including, but not limited to § 253 of the Telecommunications Act of 1996, to challenge the unlawful provisions of the Interim Agreement.

57. Specifically, Article 2 of the Interim Agreement provides that Level 3 "does not waive any right to insist upon the City's compliance with any standardized franchise or right-or-way[sic] laws mandated by state or federal law."

**D.     The Terms Of The Interim Agreement**

58. The Interim Agreement requires Level 3 to pay to the City an Annual Fee of $2.50 per linear foot for a period of 15 years.

59. The Interim Agreement calls for the Annual Fee to be increased annually. *Id.*

8

60.     The Interim Agreement also requires Level 3 to provide an in-kind payment to the City
        by installing four (4) "singlemode dark fibers" and associated appurtenances and
        facilities for the City's exclusive use.

61.     Level 3 is required to bear the entire costs of construction and maintenance of the conduit
        and associated appurtenances and facilities for the City's exclusive use.

62.     Before being imposed on Level 3 the monetary and in-kind compensation imposed in the
        Interim Agreement, including the linear foot fee and the required dark fiber strands and
        associated appurtenances and facilities for the City's exclusive use, were not publicly
        disclosed by the City.

63.     The Interim Agreement requires Level 3 to obtain prior written consent of the City before
        any assignment or transfer of ownership in the Interim Agreement, or before leasing or
        subletting all or substantially all of Level 3's Facilities.

64.     The Annual Fees imposed in Article 4.2 of the Interim Agreement do not reflect the
        City's reasonable or actual cost of managing Level 3's use or occupation of the public
        rights-of-way in the City.

65.     The Annual Fees imposed in Article 4.2 of the Interim Agreement are not equal to the
        City's reasonable or actual cost of managing Level 3's use or occupation of the public
        rights-of-way in the City.

66.     The Annual Fees imposed in Article 4.2 of the Interim Agreement are not limited to the
        City's reasonable or actual cost of managing Level 3's use or occupation of the public
        rights-of-way in the City.

67.     The City has never calculated its reasonable or actual cost of managing Level 3's use or
        occupation of the public rights-of-way.

9

68.   On December 1, 1999, paid the City a construction permit fee in the amount of
      $290.00.

69.   On December 2, 1999, Level 3 paid the City an Application Fee under Article 4.1 of the
      Interim Agreement in the amount of $500.00

70.   On December 2, 1999, Level 3 also made its first annual fee payment pursuant to the
      Interim Agreement to the City in the amount of $78,760.80.

71.   On or about June 11, 2001, Level 3 made another annual payment pursuant to the Interim
      Agreement to the City in the amount of $81,515.80.

72.   On or about December 12, 2001, Level 3 made another annual payment to the City in the
      amount of $94,502.50.

73.   The City's purpose in imposing the Annual Fees was to generate revenue for general
      purposes.

74.   The City has used the money received from Level 3 under the Interim Agreement for
      general revenue purposes.

75.   In 1999 the City earmarked funds received from Level 3 to support municipal activities
      that are unrelated to the City's management of the rights-of-way.

76.   The City has spent over $200,000 on activities that are unrelated to rights-of-way
      management.

77.   Specifically, the City has spent over $150,000 of the money received from Level 3 to
      purchase two garbage trucks.

78.   In addition, the City has set spent $50,000 of the money received from Level 3 for park
      renovations.

175589_1.DOC

79.     Paying the City an annual fee in excess of the City's costs was an absolute condition of
        Level 3's being permitted to construct its telecommunications network.

80.     The amount of payment to be required of Level 3 was not publicly disclosed before
        execution of the Interim Agreement.

81.     The amount of payment to be required of Level 3 was ultimately a matter of how much
        the City could leverage Level 3 to pay.

82.     The Application Fee imposed in Article 4.1 of the Interim Agreement does not reflect the
        City's reasonable or actual cost of responding to Level 3's request to construct in the
        public rights-of-way in the City.

83.     The City has never calculated its costs of processing Level 3's application to use the
        public rights-of-way.

84.     The requirement to provide to the City four (4) "singlemode dark fibers" and associated
        appurtenances imposed in Article 9 of the Interim Agreement does not reflect the City's
        reasonable or actual cost of managing Level 3's use or occupation of the public rights-of-
        way in the City.

        E.      The City's Treatment Of Bellsouth

85.     The Regional Bell Operating Company in the Southeastern United States, including
        Alabama, is BellSouth.

86.     BellSouth is Level 3's primary competitor for the provision of telecommunications
        services using the facilities located in Prichard.

87.     BellSouth or its predecessors-in-interest has constructed facilities in the public rights-of-
        way in the City.

175589_1.DOC

11

88.    BellSouth does not have an agreement with the City comparable to the one required of
       Level 3.

89.    Indeed, the City asserts that BellSouth has been occupying the public rights-of-way in the
       City without any authorization, apparently for years.

90.    The City does not require BellSouth (and did not require BellSouth's predecessor) to
       abide by any telecommunications or public rights-of-way regulations, equal to the
       regulations to which Level 3 is subject.

91.    During the time Level 3 has sought access to the public rights-of-way in the City, the
       City has not required BellSouth to pay any fee for its use of the public rights-of-way.

92.    The City does not require BellSouth to provide the City with any in-kind services or
       facilities as a condition of access to the public rights-of-way.

93.    The City does not require BellSouth to provide the City with a bond as a condition of
       access to the public rights-of-way.

94.    The City does not require BellSouth to obtain the City's consent to transfer its right to use
       the City's rights-of-way as a condition of access to the public rights-of-way.

95.    BellSouth has placed telephone line transmission poles in the public rights-of-way in the
       City.

96.    The City does not know how many poles BellSouth has installed in the public rights-of-
       way.

97.    BellSouth is not required to get the City's permission prior to installing its poles in the
       public rights-of-way in the City.

98.    BellSouth does not have to provide notice to the City prior to installing its poles in the
       public rights-of-way.

12

99.   BellSouth's facilities are located on nearly every street in the City.

100.   BellSouth's facilities are more extensive than Level 3's.

101.   The City's treatment of Level 3 in comparison to BellSouth, including but not limited to the imposition of the requirements of the Interim Agreement and Resolution 800-99 on Level 3 but not BellSouth, places Level 3 at a competitive disadvantage.

**F.     The City's Failure To Comply With The Terms Of The Interim Agreement And Resolution 800-99**

102.   The City has never developed a regulatory resolution that provides uniform standards applicable to all users of the public rights-of-way.

103.   The City has never completed a plan or study of rights-of-way use, costs or valuation.

104.   Neither the Mayor nor the City Council undertook a study of the costs of managing the City's rights-of-way and developed a right-of-way regulatory resolution, incorporating such cost study findings, on or before January 31, 2000.

105.   Subsequent to Level 3's construction of facilities in the public rights-of-way, the City has not incurred any costs as a result of Level 3's occupation of the rights-of-way.

106.   After construction was completed there have been one, or maybe two, instances where problems arose with respect to Level 3's restoration of the rights-of-way, but Level 3 addressed such problems at its own costs.

107.   The City has not been required to take any steps to repair the public rights-of-way after Level 3's construction.

**II.     CONCLUSIONS OF LAW**

108.   Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

13

law. *United States v. Mallard*, 2003 U.S. Dist. LEXIS 5619, *3 (S.D. Ala. Mar. 10, 2003).

109.   The substantive law will identify which facts are material and which are irrelevant. *Stedman v. Bizmart*, 219 F. Supp. 2d 1212, 1214 (S.D. Ala. 2002).

110.   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Moore v. Iron Will, Inc.*, 2001 U.S. Dist. LEXIS 2605. *8 (S.D. Ala. Feb. 21, 2001).

111.   To defeat a motion for summary judgment, a nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts. *Hicks v. Alabama*, 45 F. Supp. 2d 921, 931 (S.D. Ala. 1998).

112.   Providers of telecommunications services hold a state-wide franchise that authorizes them to construct its lines along the margin of the right-of-way of public highways. Ala. Code § 23-1-85.

113.   47 U.S.C. § 253(a) prohibits municipal regulatory schemes that fail to identify standards governing access to the public rights-of-way and in so doing permit the municipality to exercise unfettered discretion over the ability of a telecommunications provider to construct telecommunications facilities in the public rights-of-way to provide telecommunications services. *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir. 2002), *cert. denied*, 123 S.Ct. 1582 (2003); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001), *cert. denied*, 534 U.S. 1079 (2002).

114.   47 U.S.C. § 253(a) prohibits municipalities from materially inhibiting or limiting the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment. *White Plains*, 305 F.3d at 76.

14

115.   A municipal requirement need not be insurmountable in order to nonetheless have the effect of prohibiting the ability of an entity to provide telecommunications services in violation of 47 U.S.C. § 253(a). *White Plains*, 305 F.3d at 76; *RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1268 (10th Cir. 2000).

116.   Once a telecommunications provider has constructed its facilities in compliance with a city's lawful right-of-way management regulations, whether and to what extent that entity provides telecommunications service in the city is beyond the city's authority under 47 U.S.C. § 253. *Auburn*, 260 F.3d at 1178.

117.   After a violation of Section 253(a) has been established, the municipality may try to establish that the challenged requirements fall within its reserved authority under Section 253(c).

118.   However, the scope of permitted municipal authority under Section 253(c) is extremely narrow. *Auburn*, 260 F.3d at 1180.

119.   While under Section 253(c) a city has some authority to "manage" the use of the public rights-of-way, all of the city's requirements must nonetheless be competitively neutral and nondiscriminatory. 47 U.S.C. § 253(c).

120.   Under Section 253(c), a city is permitted to recover "fair and reasonable compensation," but only if the fee was publicly disclosed as well as competitively neutral and nondiscriminatory. 47 U.S.C. § 253(c).

121.   Local regulations that apply only to new entrants and not to incumbent carriers are neither competitively neutral nor non-discriminatory, as required by 47 U.S.C. § 253(c). *RT Communications*, 201 F.3d at 1268-69; *White Plains*, 305 F.3d at 80.

175589_1.DOC

122.   Section 253(c) permits municipalities to charge only fees that recover their costs incurred in managing the use of the public rights-of-way by telecommunications providers. *Auburn*, 260 F.3d at 1176; *Maryland Heights*, 256 F. Supp. 2d at 994; *City of Mobile*, 171 F. Supp. 2d at 1277.

123.   Under the legislative history of 47 U.S.C. § 253, as well as the de-regulation concept in the federal Telecommunications Act of 1996 as a whole, plainly a fee that does more than make a municipality whole is not compensatory in the literal sense, and instead risks becoming an economic barrier to entry. *Maryland Heights*, 256 F. Supp. 2d at 994.

124.   Section 253(c) reserves to the City only authority to "manage" the public rights-of-way.

125.   The scope of municipal "management" authority is limited to time, place, and manner regulation of matters involving the physical occupation of the public rights-of-way.

126.   The question is whether the regulations are designed to manage the public rights-of-way, as permitted by § 253(c), or impermissibly go further. *White Plains*, 305 F.3d at 81.

127.   A requirement is not related to management of the rights-of-way simply because the telecommunications provider has facilities in the rights-of-way. *Auburn*, 260 F.3d at 1178-80.

128.   A municipal requirement must be related to the management of the narrow issue of matters having a physical impact on the public rights-of-way. *Auburn*, 260 F.3d at 1177.

129.   Under Alabama law, a city's authority to impose taxes is limited to that authority which it has been specifically granted. *City of Mobile v. GSF Properties, Inc.*, 531 So. 2d 833, 836 (Ala. 1988); *Ala. Farm Bureau Mutual Casualty Ins. Co. v. City of Hartselle*, 460 So. 2d 1219, 1222 (Ala. 1984).

16

130.    The only authority specifically granted to the City to impose taxes on telecommunications providers is in Alabama Code § 11-51-128(a).

131.    Alabama Code § 11-51-128(a), fixes "the maximum amount of privilege or license tax which the several municipalities within this state may annually assess and collect of persons operating telephone exchanges and long distance telephone lines in this state . . ." depending on the population of the municipality.

132.    While nominally a "fee," a municipal compensation requirement imposed on a telecommunication provider is legally a "tax" were (1) the purpose of the charge was to generate revenue, (2) the amount of the charge was not rationally related to the municipalities expected costs of repairing the right-of-way, and (3) the money was not reserved only for use in paying the city's actual and reasonable costs of managing the telecommunications provider's use of the public right-of-way. *Lightwave Technologies, LLC v. Escambia County*, 804 So. 2d 176 (Ala. 2001).

133.    License taxes must bear equally and uniformly upon all persons engaged in the same class of business or occupation or exercising the same privileges. *Rochelle v. Florence*, 188 So. 247, 250 (Ala. 1939).

134.    A breach of contract occurs where it is shown that: (1) there exists a valid contract binding upon the parties; (2) the plaintiff has performed under the contract; (3) the defendant has not performed under the contract; and (4) damages result. *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 673 (Ala. 2001).

135.    Under Alabama law, all contracts are subject to the implied covenant of good faith and fair dealing. *Hoffman-La Roche v. Campbell*, 512 So.2d 725, 739 (Ala. 1987).

17

136.    The covenant of good faith and fair dealing imposes the obligation to preserve the spirit of the bargain rather than the form, and is a group of specific rules which evolved to insure that the basic purpose of contract law is carried out, the protection of reasonable expectations of parties induced by promise. *Id.*

137.    A violation of 42 U.S.C. § 1983 is established if a city has acted under color of law when it violated the plaintiff's federal statutory rights, and the city's acts violated some right, privilege or immunity protected by the Constitution or laws of the United States. *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir. 1985); *Gonzaga Univ. v. Doe,* 536 U.S. 273 (2002); *Blessing v. Freestone,* 520 U.S. 329, 340 (1997).

138.    When Section 1983 liability attaches to a municipality, the Court must also determine whether or not the municipality acted pursuant to an official municipal policy. *Monell v. Department of Social Serv. of N.Y.,* 436 U.S. 658, 691 (1978).

139.    However, the municipality need not expressly adopt an official municipal policy to be liable under Section 1983. *Webb v. Sloan,* 330 F.3d 1158, 1164 (9th Cir. 2003).

140.    Any federal injury arising from execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, gives rise to such liability. *Monell,* 436 U.S. at 694.


In light of the foregoing determinations of undisputed fact, and this Court's conclusions of law, the Defendant/Counterclaim Plaintiff's motion for summary judgment on all counts of the Defendant/Counterclaim Plaintiff's counterclaims and affirmative defenses is due to be, and is hereby, granted.


_____
Senior United States District Judge


18