IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

The City of Prichard, Alabama,
A municipal corporation,

       Plaintiff,

v.

Level 3 Communications, LLC,
A Delaware limited liability company,

CASE NO. 03-248-P-C

FILED FEB 25 '04 PM 4:31 USDCALS

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to *Fed.R.Civ.P.* 56, Local Rules 7.1 and 7.2(b), and the Court's December 10, 2003 Order, Plaintiff/Counterclaim Defendant City of Prichard ("City") submits the following memorandum in opposition to Defendant/Counterclaim Plaintiff Level 3 Communications, L.L.C.'s ("defendant" or "Level 3") Motion for Summary Judgment ("motion"). In support of this opposition, City incorporates herein its Notice of Filing of Exhibits Supporting City's Opposition to Defendant's Motion for Summary Judgment, and City's Response To Defendant's Statement Of Material Facts Not In Dispute filed in connection with this Opposition Memorandum. This opposition supplements the previously

filed memorandum in support of the City's Motion for Summary Judgment on Counts II and V of the defendant's counterclaims. For the reasons set out herein, in the City's previous memorandum supporting its summary judgment motion, in the City's opposition of Level 3's Statement of Material Facts Not In Dispute. and in the City's Second Motion for Summary Judgment filed contemporaneously herewith, the defendant's motion is due to be denied,  and counterclaim counts II and V (and associated affirmative defenses) dismissed.

I.    STATEMENT OF THE CASE

This litigation was initiated on March 14, 2003 when the City filed suit against Level 3 in the Circuit Court of Mobile County, alleging breach of contract. The City complained that Level 3 failed to pay the City as agreed in an Interim Rights-Of-Way Use Agreement ("Agreement") pursuant to which Level 3 used the City's municipal rights-of-way for its fiber optic cable in return for payment of an annual use fee.

On April 25, 2003, the defendant removed the case to Federal court. The company answered and asserted affirmative defenses and counterclaims under both state and federal law. On December 10, 2003, the City moved for summary judgment on Counts II and V of defendant's counterclaims. That motion is pending. On January 14, 2004, Level 3 filed a summary judgment motion on all of its counterclaims and on affirmative defenses 2, 3, 4, 5, 6, 7 and 9. The City has filed contemporaneously herewith its opposition to defendant's Statement of Undisputed Facts and has filed a further motion for summary judgment with respect to counterclaim count 2.

## II.   STANDARD FOR SUMMARY JUDGMENT

Pursuant to *Fed.R.Civ.P. 56*, summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322; 106 S.Ct. 2548, 2552; 91 L.Ed.2d 265 (1986).The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial. "*Id*. at 324, 106 S.Ct. at 2553. A court ruling on a motion for summary judgment must "view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Pickett v. DeKalb County*, 349 F.3d. 1294, 1296 (11th Cir. 2003).

## III.   STATEMENT OF THE FACTS.

Background.

Prichard is a municipality with a population of about 28,000 people and lies adjacent to and north of the City of Mobile, Alabama. Under Alabama law it is a class five municipality with municipal powers as set out in Alabama Code §11-43C-1 et. seq.

Level 3 is a telecommunications company formed in 1997. Over the next three years it developed a fiber optic cable network in the United States and elsewhere. A map of Level 3's United States network appears as Plaintiff's Exhibit 25. (References to "Plaintiff's Exhibit" ("P.Exh.") are to the exhibits in the Notice of Filing of Exhibits Supporting City's Opposition to Defendant's Motion for Summary Judgment.) Part of the Level 3 fiber optic network route in Alabama runs from southern Mississippi to northwestern Florida through Mobile and Baldwin Counties.  The other Alabama portion of the network runs from north Alabama through Huntsville and Birmingham, and then east to Atlanta.

Level 3's fiber optic cable runs through conduit which is buried underground. Within the cable are a bundle of strands of fiber optic material. Data is transmitted over the network in the form of light signals sent through these strands of fiber. Since the light signals are carried long distances, periodically the light signal must be amplified or in some cases regenerated. The facility used for this purpose is called an in line amplifier (ILA) or a regeneration (3R) site. (P.Exh. 13-Meade Dep., 25:16; 26; 27; 28 ;29; 30; 31;32)

In late 1999 and early 2000, Level 3 buried approximately 37,000 feet of conduit in the City's right of way. The Level 3 conduit is a concrete pipe containing 12 holes, each 1.25 inches in diameter. Level 3 presently uses only one of the holes. The other 11 are empty. Through that one hole Level 3 pulled a fiber optic cable containing 96 separate fiber strands. Level 3 has leased some of the 96 fiber strands to third parties under indefeasible right of use agreements (IRU). (Meade Dep., 108; 122; 123; 124; P.Exh. 13.)  While four of the fiber strands were made available to the City of Prichard pursuant to the Agreement,

City has never used them and they remain 'dark'(as opposed to lit). Level 3 carries its own traffic on the remaining fiber strands.

In addition to building underground, Level 3 constructed a building on property it owns on Telegraph Road in Prichard. The building houses Level 3's in line amplifier and regeneration equipment. The structure also contains equipment owned and 'collocated' there by third parties using fiber under IRU agreements. The Telegraph Road facility is unmanned. This building is Level 3's only above ground facility in Prichard, except for markers indicating that a cable is buried below.

Level 3 has no end user customers in Prichard. No telecommunications traffic enters or leaves Level 3's network in Prichard. The traffic on the network simply passes under the City, with amplification or regeneration of the signal as needed. Level 3 does not have a Prichard business license. (Meade Dep. 25:4-15; 131-2-7, P. Exh. 13) (C.Norwood aff. ¶ 15, P. Exh. 18)

This lawsuit concerns the terms and conditions under which Level 3 is using the City's rights of way to conduct business.

Negotiation of the Agreement-"The City's financial problems are over."; "The City was going to be rich."

In June 1999, David Chavez, an agent of Level 3, approached the City requesting use of the City rights of way to install an underground fiber optic cable. He spoke with Ellis Bea, the City's Director of Inspection Services about Level 3's plans, and told him that the cable would be a financial boon to the City. "The City was going to be rich," and "The

City's financial problems are over," Mr.Bea was told. (Bea deposition, 18:11-23, 106:3-18, P.Exh. 23.)

Prichard's financial problems at the time were severe. The City had stopped making contributions to the employees' pension fund and had stopped remitting federal income tax withholdings from employees' paychecks. A Chapter 9 Bankruptcy Petition would follow on October 3, 1999. (See Defendant's Exhibit 7, the City's Chapter 9 Petition Disclosure Statement.) Level 3's overture was welcomed news in the cash strapped municipality.

In late October, 1999 Diane Burkhardt, an employee of Gilbert Network Solutions and an agent of Level 3, began negotiating an agreement to allow Level 3 to use the City's rights-of-way. She met with then Mayor Jessie Norwood who turned over negotiations to City Attorney Greg Harris. Mr. Harris worked part time as City Attorney and had no experience in telecommunications law. (P.Exh. 12, ¶¶2 6, 7, 9, 10.) In addition to Burkhardt, Bebb Francis, a telecommunications attorney in San Antonio, Texas, represented the interests of Level 3. Level 3's in-house counsel was also involved, as were members of the Fraser Stryker law firm. (Meade Dep. 47:8-22; 48; 49, P. Exh. 13) (Burkhardt dep. 29:7-16; 31:15-17; 83:12-15, P.Exh. 26)

The Agreement was the product of negotiations between the City and Level 3. The Agreement ultimately reached by the parties was modeled on two Mobile County documents which had been provided by Level 3 to Prichard. (Burkhardt Dep. 34:1-16, P.Exh. 26.) The first document was a Mobile County resolution, and the second document was entitled "Interim Rights-Of-Way Use Agreement." Burkhardt sent these Mobile County documents

to Harris, together with an explanatory cover memorandum authored by Mark Hildebrand, another Gilbert employee. (Harris Affidavit ¶¶9,P.Exh. 12; P.Exh. 2.)

Through a series of telephone conversations, meetings and e-mail communications, extending up until November 30, 1999, additions and modifications were made by the parties to the Mobile County Agreement. Level 3 offered to compensate the City of Prichard at the rate of $2 per linear foot of cable for a 15-year term. The City responded with an offer of $2.75 per linear foot and a 3% annual inflation adjustment. The final terms were a 15-year term with compensation at the rate of $2.50 per linear foot and a 1% annual inflation adjustment. Other non-monetary terms were also negotiated, one of which allowed Level 3 to lease fiber strands to third parties. (Harris Affidavit ¶¶9-27, P.Exh. 12.)

The Agreement was passed by the Prichard City Council on November 30, 1999 and signed by the mayor the following day. (P.Exhs. 11 and 21.) Level 3's representative signed the Agreement on December 30, 1999. Level 3 began construction in Prichard shortly thereafter.

Performance under the contract.

Level 3 obtained a permit, posted a bond and commenced work in the City's right-of-way. The buried conduit was completed by the spring of 2000 and Level 3 continues to this present day to occupy and operate in the City right-of- way.

Level 3 tendered a check to the City of $78,760.80 as the first annual payment on December 2, 1999 for the year 2000. That amount was derived from the terms of the Agreement, which provided that Level 3 would pay $2.50 per foot (a total of 36,720 feet) of underground fiber optic cable laid within the City limits of Prichard, less $13,039.20, which

was the 50% of the agreed cost, of the 4 (four) dark fibers installed for the use of the City. On June 11, 2001 Level 3 made a payment of $81,515.80 (which amount again included a reduction of $13,039.20 for the dark fibers) for the year 2001, and a payment of $94,502.50 on December 12, 2001, for the year 2002.

Level 3's Breach of the contract.

By a letter dated December 9, 2002, from Raymond Bell, Esq., the City was informed that Level 3 intended to renegotiate the Agreement. (P.Exh. 28) That letter was the first communication by Level 3 to the City of any problems which Level 3 had with the Agreement. By letter dated January 17, 2003, Greg L. Rogers, an in-house attorney for Level 3, forwarded a check to the City for $27,540, representing payment at $.75 per foot of Level 3 fiber optic cable in Prichard.. (Rogers letter, P.Exh. 22.) That amount was approximately $67,000 less than the amount which Level 3 had agreed to pay under the Agreement. Level 3 has paid nothing for the year 2004.

## IV.   INTRODUCTION TO ARGUMENT

Level 3 admits it has refused to pay the City of Prichard the sum it agreed to pay for use of the City's rights of way. (Defendant's supporting memorandum, p. 27 n.10) At present the company owes the City at least $ 165,000, which represents underpayment for the year 2003 and non-payment for the year 2004. Level 3 continues to make commercial use of the City's property -- its rights of way -- and seeks to do so in the future.[1] The

---

[1] Level 3 not only uses the City's rights-of-way to transmit its own traffic, it has also 'sold' strands of fiber in the City rights-of-way to third parties under IRU agreements. (Meade dep. 123; 124, P. Exh.13) Obviously, Level 3 must continue to occupy the rights-of-way in order to fulfill its contracts with those to which it sold IRUs.

company's counterclaims and affirmative defenses are an effort to maintain the benefit of the bargain without paying.

For the sake of clarity, Level 3's state law claims, counts II (illegal tax), III (breach of contract) and IV (beach of duty of good faith) will be addressed first. Alabama substantive law governs decision on these claims. *Technical Coating Applicators, Inc. v. United States Fidelity and Guarantee,* 157 F.3d. 843, 844 (11th Cir. 1998). The federal claims, counts I (47 U.S.C. § 253) and V (42 U.S.C. § 1983) will then be addressed.

V.   LEVEL 3'S CLAIM IN COUNT II THAT THE FEE IT AGREED TO PAY FOR USE OF THE CITY'S PROPERTY FOR ITS BUSINESS CONSTITUTES A TAX IS WRONG AS A MATTER OF STATE LAW

Level 3's motion for summary judgment on Count II and affirmative defenses 6 and 7 should be denied, and judgment rendered for the City on its motion for summary judgment. The City incorporates its argument on this issue found in the plaintiff's memorandum in support of its second motion for summary judgment on counterclaim Count II.

VI.   SUMMARY JUDGMENT SHOULD BE DENIED ON LEVEL 3'S BREACH OF CONTRACT CLAIMS BECAUSE THE CONTTRACT IS AMBIGUOUS, THE CONTRACT CLAUSE COMPLAINED OF IS UNENFORCIBLE, LEVEL 3 IS IN BREACH, LEVEL 3 ACTED IN BAD FAITH, AND THE ALLEGED BREACH BY THE CITY IS NOT MATERIAL

Level 3 admits it has refused to pay the City of Prichard the sum it agreed to pay for use of the City's rights of way, and admits that it continues to make commercial use of the City's property. Notwithstanding Level 3's admitted breach of the agreement, the company

9

seeks damages from Prichard alleging the City breached the agreement. Summary judgment should be denied because the complained of provisions in the Agreement are an unenforceable agreement to agree; because there is a jury question as to construction of the ambiguous material terms of the agreement; because there is a jury question whether the City breached the agreement; because there is a jury question whether any alleged breach was material, and because a jury question exists as to whether Level 3 was damaged by any alleged breach.

Contract ambiguity precludes summary judgment.

Level 3 maintains that the City beached the agreement by failing to conduct the study referenced in Resolution 800-99. Level 3 argues that because "... "the City has failed to undertake a rights-of-way management cost study, Level 3 has been forced to pay unlawful and unreasonable fees, and provide unlawful and unauthorized in-kind payments to the City." (Defendant's memorandum p. 27).

The City did not conduct the study. However this failure is not a material breach since the results of any study would not have changed the terms or effect of the Agreement. This result is compelled by analysis of the specific provisions of the Agreement relating to a future telecommunications ordinance: Articles 2, 4.2 and 12.5, and Resolution 800-99.

Summary judgment in a contract case is appropriate where "the terms within a contract are plain and unambiguous." However, "if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury." *McDonald v. U.S. Die Casting & Dev. Co.,* 585 So.2d 853,

855 (Ala.1991)(Quoted with approval in *Reeves Cedarhurst Dev. Corp. v. First Amfed Corp.,* 607 So.2d 184, 186 (Ala.1992). "The meaning of [ambiguous] terms is a question of fact for the jury, to be decided by the surrounding facts and circumstances." *Hall v. Integon Life Ins. Co.,* 454 So.2d 1338, 1342 (Ala.1984); *Medical Clinic Board of the City of Birmingham-Crestwood v. Smelley,* 408 So.2d 1203, 1206 (Ala.1981); *Shirley v. Lin,* 548 So.2d. 1329 (Ala. 1989).

While an ambiguity in a contract does not automatically make the contract void, once the trial court determines that a contract is ambiguous, it is for the jury to determine the true meaning of the contract. *Ex parte Conaway,* 767 So.2d 1117, 1119 (Ala., 2000); *Decker v. Marshall-DeKalb Elec. Coop.,* 659 So.2d 926 (Ala.1995)

Level 3's legal position that, as a result of the failure to undertake a rights-of-way management cost study, it has been forced to pay unlawful and unreasonable fees depends on a chain of unsupported and legally insufficient assumptions, as follows:

1) The first assumption is that Council's resolution legally obligated the Mayor to undertake the study. The argument assumes, incorrectly, that the legislative branch, the Prichard City Council, can compel the executive, to conduct a study. While Resolution 800-99 'directs' the mayor to undertake a study, the resolution is simply an expression of opinion by the body. It does not have the force of law, as would an ordinance. "An ordinance is distinctly a legislative act. A resolution, generally speaking, is simply an expression of opinion or mind or policy concerning some particular item of business coming within the legislative body's cognizance, ordinarily ministerial in character and relating to the

administrative business of the municipality." *McQuillin Mun. Corp.* §15.02 (3rd Ed); See *Biloxi Firefighters Association v. City of Biloxi*, 810 So.2d. 589 (Miss. 2002).

2) The second assumption is that the results of the study would be favorable to the Company. This is entirely speculative. The stated objective of the study was to set standards to "reimburse the City for its costs and provide compensation for occupancy and use of the rights-of-way." The total of 'costs' plus what in the City's view would be adequate 'compensation' might well be more than the $2.50 per foot agreed to by the parties. In any event, the total is indefinite.

3) The third assumption is that a resolution (embodying the favorable study results) would be passed by a future City Council. The study was to be conducted by the City's executive branch. Only the City Council has the authority to legislate. Alabama Code §11-43C-21. The date on which the mayor was to produce the proposed resolution for the Council was on or before January 31, 2000, "absent unanticipated delays'."[2] The Agreement specifies no date for council action, and no assurance that the Council would ever pass a telecommunications ordinance in the form to be recommended by the mayor based on the hypothetically favorable study, or pass any ordinance whatsoever.

The language used in the Agreement shows that the parties understood that a permanent ordinance might not be enacted. Article 2, setting out the 15 year term of the Agreement, states: "It is understood by the provider that the City *contemplates* adoption of a telecommunications ordinance …" The word contemplate does not mean 'will' or 'shall;' rather the word contemplate means "To consider, meditate on or ponder." (*Merriam Webster*

---

[2] Prichard's municipal bankruptcy and the impeachment and indictment of the Mayor and council members created chaos in city government. Harris affidavit ¶¶28, 29, P.Exh. 12.) (J. Norwood dep. 11:6-18,P.Exh. 19)

*On Line Dictionary,*www.merriam-webster.com) Article 4.2, setting out the compensation over the 15 year term recites that "*If* the City adopts a telecommunications Resolution prior to the expiration of this agreement [15 years hence]…" The use of the introductory word "if" means the action is conditional in the sense of "in the event that." (*Merriam Webster On Line Dictionary,* www.merriam-webster.com)  Absent evidence to the contrary, "the words of an agreement will be given their ordinary meaning." *Flowers v. Flowers*, 334 So.2d 856, 857 (Ala.1976).

An agreement to make unspecified changes to a contract based on future speculative action is unenforceable in Alabama as an 'agreement to agree.' *Mobile Eye Center, P.C. v. Van Buren Partnership*, 826 So.2d 135, 138 (Ala., 2002)("renewal provision was merely an agreement to agree to a renewal of the lease, which is not enforced in Alabama") ; *Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.,* 508 So.2d 225, 227 (Ala.1987); *Dixieland Food Stores, Inc. v. Geddert,* 505 So.2d 371, 373 (Ala.1987)("In order to be enforceable, a contract to enter into a future contract must be definite and certain in all its terms and conditions....") *Mobil Oil Corp. v. Schlumberger*, 598 So.2d 1341, 1345 (Ala.1992); *Howard v. Ryder Truck Rental One-Way, Inc.* 624 So.2d 169, 170 (Ala., 1993)

4) Level 3's final--and fatal-- inference is that the (hypothetical) terms of the (presumptively) favorable future telecommunications ordinance would in fact cause Level 3 to pay less compensation than $2.50 per linear foot. However,  the parties drafted the agreement in such a way that regardless of whether a study was done and regardless of the terms of such a future telecommunications ordinance, if enacted, the compensation terms of the agreement would not change. The parties agreed that the $2.50 per linear foot

compensation (with inflation adjustment) would be both a floor and a ceiling <u>throughout</u> the

15 year term of the agreement.

The 'floor' clause, drafted by the City[3], is found in Article 2 and provides:

> "It is understood by the provider that the City contemplates adoption of a telecommunications ordinance after the execution of this agreement, however, provider expressly waives any right to challenge the fee structure contained in such contemplated ordinance unless the ordinance subjects the provider to a fee structure in excess of that agreed to by the City and Provider herein."

The 'ceiling' clause, drafted by Level 3[4], is found in Article 4.2 and provides:

> "If the City adopts a telecommunications Resolution prior to the expiration of this agreement, the fee established in said resolution shall apply as of the date of execution of this agreement and shall not exceed the fee established herein."

These 'floor' and ceiling' clauses, which protected the interests of both parties in

stability of the price term over the 15 year life of the agreement, rendered meaningless the

'renegotiation' provision of Article 2 which was carried over from the Mobile County

template agreement.[5]

Level 3 also argues that "because the City has failed to adopt and enforce a uniform

regulatory resolution, Level 3 has been forced to operate under the terms of the Interim

Agreement while its primary competitor, BellSouth, has not been required to operate under

similar conditions, thus placing Level 3 at a competitive disadvantage." (Defendant's

supporting memorandum, page 27).

---

[3] This clause first appears in the 2nd draft P.Exhs.7and 12(¶19).
[4] This clause first appears in the 1st draft. P.Exh. 4 and 12 (¶15).
[5]  This 'renegotiation' language taken from Article 2 of the Mobile County agreement was to have been stricken from the final Prichard agreement. See the draft agreement P.Exh. 7. Bebb Francis, Level 3's attorney notes that the only change to the draft is the sublet language in Article 3. See Francis e-mail, first page of P.Exh. 9; Harris aff. ¶22, P.Exh. 12 . The change was simply not cleaned up in the final draft, like the change in the inflation adjustment, found in Article 4.2.In any event the provision is moot.

Again, the terms of any future regulatory regulation are entirely speculative. Level 3 does not explain how the terms of any hypothetical future telecommunications ordinance which a City Council may enact would effect its competitive position with regard to Bellsouth. As noted, Level 3 agreed the compensation term of $2.50 per linear foot of cable per year was to be unaffected by any future ordinance enacted during the 15 year term.

Finally, Bellsouth, by virtue of pre-existing Alabama law, is not subject to the City of Prichard's franchise authority and would not be generally subject to a future telecommunications ordinance. In *Bellsouth Telecommunications, Inc.* v. *City of Mobile* 171 F.Supp.2d 1261 (S.D. Ala., 2001) the court discussed Bellsouth's status:

> BellSouth is a Georgia corporation that provides telecommunications services throughout the southeastern United States. Since 1879, when it was originally incorporated as the Southern Bell Telephone and Telegraph Company, BellSouth has held a statewide franchise from the State of Alabama that authorizes it to build and operate telecommunications facilities along the public rights of way (i.e., the public streets and highways). Pursuant to this franchise, BellSouth has built an extensive network of telephone lines and related facilities to provide telecommunications services to individuals, businesses, and governmental entities in the State of Alabama, including the City of Mobile.

Bellsouth's statewide franchise predates the Alabama Constitution of 1901 and the incorporation of the City of Prichard in 1925[6]. As a result, § 220 (codified in §11-49-1) does not apply to Bellsouth. It is because of § 220 that Level 3 was required to have an agreement with the City of Prichard in order to use the rights of way.

---

[6] Bellsouth's franchise to use the state rights of way covers both state and county highways, and city streets. Bellsouth's franchise predates the passage of Section 220 to the Constitution of 1901, and Alabama Code §11-43-62 which placed regulation of telecommunications companies' "...use of the streets for the erection of telegraph, telephone, electric and all other systems of wires and conduits..." in the city council, and authorized the council to "sell or lease in such manner as it may deem advisable any franchise which it has power to grant, and the moneys received therefor shall be paid into the city treasury."

"No person, firm, association, or corporation shall be authorized or permitted to use the streets, avenues, alleys, or public places of any city, town, or village for the construction or operation of any public utility or private enterprise, without first obtaining the consent of the proper authorities of such city, town, or village."

Level 3 was not harmed by the City's alleged failure to enact a future telecommunications ordinance (of uncertain terms), because that ordinance could not be applied to Bellsouth.

In summation, Level 3's motion for summary judgment should be denied because the language of the agreement is at least ambiguous as to the necessity of and effect of a future telecommunications ordinance. The renegotiation language is an unenforceable 'agreement to agree.' At least an ambiguity in construction of the agreement is created by the 'ceiling' and 'floor' clauses, which render meaningless the 'renegotiation' clause. Finally, there is at least a factual dispute as to whether City substantially performed its obligation under the agreement by allowing Level 3 to use its rights of way for the company's commercial purposes. "Whether a party has substantially performed a promise under a contract is a question of fact to be determined by a jury from the circumstances of the case." *Cobbs v. Fred Burgos Construction Co.,* 477 So.2d 335, 338 (Ala.1985).

Level 3 also argues that the City breached the covenant of good faith implied in the contract. "This principle of justice forbids attempts by the actor to get more for himself than the other party reasonably contemplated giving him at the time the contractual relationship was entered into, absent good cause." The City submits that it was Level 3 which acted in bad faith. Level 3 had vast experience dealing with right-of way issues. Level 3 had both in house and outside telecommunications counsel. Level 3 takes the position that it 'knew' at

the time the contract was entered into that the terms were 'illegal.'[7] Level 3's position is that it can sign an agreement, get its fiber in the ground, then renege on payment. It is Level 3 which has acted in bad faith. "There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract; ... in every contract there exists an implied covenant of good faith and fair dealing." *Sellers v. Head*, 73 So.2d. 747, 751 (1954). Level 3 has simply stopped paying for use of the City's property, yet continues to not only use it, but receive payment from third parties for the use of that property.[8]

For three years Level 3 honored the terms of its agreement. Mayor Norwood was impeached and removed from office in May of, 2000. A new Mayor and City Council came into office in October 2000. Not surprisingly, the matter "slipped off [Level 3's] radar, (Meade dep. 135; 136, P.Exh. 13) because there was nothing to renegotiate. The parties had agreed that $2.50 per linear foot per year would be the compensation throughout the 15 year term.

### VII.   THE COURT SHOULD DENY SUMMARY JUDGMENT AS TO COUNT I, BECAUSE LEVEL 3 HAS FAILED TO MEET ITS BURDEN OF PROOFING UNDER SECTION 253(a) THAT THE AGREEMENT WHICH IT NEGOTIATED PHOHIBITED OR EFFECTIVELY PROHIBITED IT FROM PROVIDING SERVICES. FURTHER THE CITY IS ENTITLED TO THE SAFE HARBOR PROVISION OF SECTION 253(c)

---

[7] Level 3 specifically stated in response to the City's interrogatory in this regard: "that it was of the opinion that the demands and actions of the City and terms of the Interim Agreement were unlawful, and contrary [sic] federal and state law." (Level 3's Response to City's Discovery Request #16, P.Exh, 31.) Level 3 admitted in brief (page 14) that it could have sought a declaratory judgment to determine the legal issue involved, but claims that would have resulted in delay of the project and bankruptcy. Level 3, of course, does not explain why the declaratory judgment could not have been filed once the fiber was in the ground and the City had not relied on the company's annual payments.
[8] Meade dep. 123; 124:4-22,P.Exh.13.

Level 3 claims in Count I that it should not be held to the terms of the agreement it negotiated with the City of Prichard because the Agreement was preempted by §253 of the Telecommunications Act, 47 U.S.C. §253. [9] Because of this preemption, it argues, the Court should excise and reform the Agreement so that Level 3 will enjoy free use of the city's property to conduct its commercial venture. Level 3 also complains about non-economic terms of the agreement as violations of §253, [10] but make no mistake, this case is about money.

As a threshold matter, Prichard's right to obtain compensation for Level 3's private commercial use of its infrastructure is a matter of property rights, not regulation. Prichard has a constitutionally protected right under the Takings Clause of the Fifth Amendment to the United States Constitution to security in its property. Obviously the federal government did not do in the Telecommunications Act on behalf of private entities that which it cannot do itself – that is, take municipal property without just compensation. *United States v. 50 acres of land*, 469 US 24; 105 S.Ct. 451; 83 L.Ed. 2d. 376 (1984) (takings clause construed "as encompassing the property of state and local governments when it is condemned by the

---

[9] 47 U.S. C. provides in relevant part:

a) In general

    No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

      * * *

(c) State and local government authority

    Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

[10] The non-economic terms will be discussed infra, but suffice it to say that Prichard has never refused Level leave to provide any service or to conduct any act with respect to Level 3's business in Prichard or elsewhere, and Level 3 has never asked. (Meade depo. page 73:2-13, P.Exh. 13)

United States. Under this construction, the same principles of just compensation presumptively apply to both private and public condemnees."): *United States v. Carmack*, 329 U.S.230, 242; 67 S.Ct. 252, 257; 91 L.Ed. 209 (1946).

Congress has said in §253 that municipalities cannot through regulation stifle competition by prohibiting telecommunications companies from access to the municipal rights of way. Congress did not, and could not consistent with the Fifth Amendment, require municipalities to give telecommunications companies free use of the public rights of way. Section §253(c) expressly provides that municipalities can receive 'fair and reasonable compensation' as a condition to right of way use. The Agreement entered into between Level 3 and Prichard provides just compensation for the company's use of the public rights-of-way and is not prohibited by §253(a). [11]

In *Bellsouth Communications Inc. v. Town of Palm Beach* 252 F.3d 1169 (11th. Cir. 2001) the court set out the framework for analysis of Level 3's § 253 claim. Level 3 must show that the Agreement violates §253(a) by prohibiting or effectively prohibiting the ability of Level 3 to provide telecommunications service. The provisions of subsection (c) are to be used defensively by local government, and come into play only after the party seeking preemption under §253(a) has shown that the local ordinance was a prohibition or had that effect. *Id.* at 1188-89. This is because "It is clear that [subsections] (b) and (c) are exceptions to (a), rather than separate limitations on state and local authority in addition to those in (a)." *Id.* at 1188. "*If* the district court finds any of these provisions violate (a), *then*

---

[11] See Frederick E. Ellrod III, Nicolas P. Miller, Property Rights, Federalism, and the Public Rights-of-Way, 26 Seattle U.L. Rev. 475 (Winter 2003). A thorough, recent law review article collecting and discussing §253 cases and the right of municipalities to obtain compensation for use of public property.

the Cities shall have an opportunity to establish that the provisions are nevertheless not preempted because they fall within the safe harbor provided in (c)." *Id* at. 1192 (emphasis supplied). [12]

Stated succinctly, "if the challenged requirements do not prohibit or have the effect of prohibiting the ability of an entity to provide telecommunications service, §253 does not preempt the requirements and the court's inquiry is complete." *Qwest Corporation v. City of Portland*, 200 F.Supp.2d. 1250 (D. Ore. 2002)

The court should deny summary judgment because Level 3 has not made the requisite threshold showing of either an actual or an effective prohibition against it providing telecommunications services. The Agreement between Level 3 and Prichard did not prohibit the company laying cable and conducting business. Level 3 is doing business in Prichard and does not contend otherwise. [13]

Level 3 has not shown an effective prohibition either. The question under §253 is what does it mean to effectively prohibit one from providing telecommunications service. Level 3's principal contention is that the $2.50 per linear foot annual use fee is in effect a prohibition against the providing of telecommunications services. This is incorrect.

---

[12] Because it cannot show that Prichard actually or effectively prohibited it from providing services, in brief Level 3 collapses subsections (a) and (c) of §253 into hybrid standard. This is contrary to the law in this circuit. *Bellsouth Communications Inc. v. Town of Palm Beach, supra.*

[13] Level 3 argues that Article 10 of the Agreement is such a prohibition. This is incorrect. First, Article 10 simply makes clear the limited scope of the franchise granted Level 3. What Level 3 bargained for was the use of specific property of the City, the route set out in Exhibits A and B to Article 1.2. Without Article 10, Level 3 would have carte blanc to engage in any business on any City property without additional compensation, which would be a violation of Alabama constitution of 1901 § 94 (as amended by §112) and §220. In any event, Article 10, which Level 3 has never sought to modify, is severable pursuant to Article 12.2. The court should undertake the severability analysis only after determining the reach of preemption. *Bellsouth Communications v. City of Palm Beach*, 252 F3d. 1169, 1192 (11th Cir. 2001)

In *Qwest Corporation v. City of Portland,* 200 F.Supp.2d 1250 (D. Ore. 2002) a tele-communications provider challenged various terms of franchise agreements under which Oregon cities charged Qwest a percentage of revenues in exchange for use of the public rights-of-way claiming preemption under §253. The cities counterclaimed for past due fees. The court held the party seeking preemption under §253 must show the fee requirements 'effectively achieve the same result" as a prohibition. *Id.* at 1255. See *Qwest v. City of Berkeley,* 208 F.R.D. 288, 294 (N.D. Calif. 2002).

The court denied Qwest's motion for summary judgment and granted the cities' motions. The court said:

> Qwest has not shown that the Cities' revenue-based fees, or other franchise requirements, have barred Qwest's entry into any markets. Qwest has managed to provide telecommunications services in the Cities for many years while laboring under the allegedly prohibitive right-of-way fees and other requirements. Qwest has not pointed to a single telecommunications service that it, or any other entity, is effectively prohibited from providing because of the Cities' revenue based fees or any other challenged requirements."
> *Id.* at 1256.

Level 3 argues that 'the most blatant and direct barrier to entry imposed by the City is its disparate treatment of Bellsouth." The argument is that since Level 3 is subject to the terms of the Agreement (including the use fee), and Bellsouth is not, Level 3 is "at an inherent competitive disadvantage." (Defendant's supporting memorandum, page 12) A claimed 'inherent disadvantage' (not otherwise quantified) is not proof of an effective prohibition to providing services.

Level 3's 'discrimination' argument was made and rejected in *TCG Detroit v. City of Dearborn*, 206 F.3d. 618 (6th Cir. 2000). There the TCG asserted the franchise fee it was

charged to use the pubic right of way was a violation of §253 because another provider, Ameritech was not required to pay the fee. Like Bellsouth[14], Ameritech enjoyed the benefits of a century old franchise granted by the state. The *Dearborn* court said "The fact that Ameritech prevailed before the district court in its contention that [Michigan] state law prohibits the City from subjecting it to the franchise fee charged others does not mean that the City is thereby discriminating in Ameritech's favor." *Id.* at _____.

The court recognized that

"Possibly, if Ameritech thus enjoys a state-mandated freedom from such fees, its competitive position is strengthened, and it might be able, in theory, to undercut its competition; if it did so, the result might be a barrier to newcomers." *Id.* at ___.
Here Level 3 has produced no factual support which would permit the court to grant summary judgment that the user fee Level 3 pays is effectively a prohibition, as opposed to a possible disadvantage. [15]

Level 3 next contends that the City violated § 253(a) in its requirement that the company enter into a franchise agreement at all, because the City did not have a general telecommunications ordinance on the books at the time Level 3 sought to use the rights of

---

[14] In *Bellsouth Telecommunications, Inc.* v. *City of Mobile*, 171 F.Supp.2d 1261 (S.D. Ala., 2001) the court discussed this status:

BellSouth is a Georgia corporation that provides telecommunications services throughout the southeastern United States. Since 1879, when it was originally incorporated as the Southern Bell Telephone and Telegraph Company, BellSouth has held a statewide franchise from the State of Alabama that authorizes it to build and operate telecommunications facilities along the public rights of way (i.e., the public streets and highways). Pursuant to this franchise, BellSouth has built an extensive network of telephone lines and related facilities to provide telecommunications services to individuals, businesses, and governmental entities in the State of Alabama, including the City of Mobile.

Level 3 was required by Alabama Code § 11-43-62 to obtain a municipal franchise, while Bellsouth holds a statwide franchise predating § 220 of the Alabama Constitution of 1901.

[15] (Meade Dep. pages 92:16-22; 93:1-7, P. Exh 13)

22

telecommunications ordinance on the books at the time Level 3 sought to use the rights of way in 1999, thus permitting the City 'unfettered' discretion in crafting an agreement with Level 3. This argument is difficult to follow. Is Level 3 suggesting that once the Telecommunications Act became law in 1996, every municipality in America was required to enact a general telecommunications ordinance in the off chance that a telecommunications provider would seek permission to use the rights of way? Level 3 was the first, and only, post telecommunications act company to seek to construct in the City's rights of way.[16] There is no statutory authority for the proposition Prichard violated §253 by failing to have an ordinance at the ready.[17]

Level 3 complains that the City violated §253 by failing to publish the right of way fees. The Agreement was passed in a public meeting and is found in the City records which are available for public inspection.[18] Beyond this, Level 3 has failed to show any injury by the claimed shortcoming. Level 3 knew the terms—it negotiated them.

Level 3 complains that it 'accepted the Interim Agreement because it had no choice." (Defendant's supporting memorandum, p. 13) This is disputed by the City. Level 3's engineers selected the route of the cable; Level 3's agent provided the Mobile County template Agreement and offered $2.00 per linear foot annually for 15 years; Level 3's

---

[16] (Bea Dep.15:13-23, P. Exh. 23)

[17] Level 3 contends that it should have been permitted to travel under to City's excavation ordinance, No. 1736. That ordinance is not the grant of the *right* to occupy the City's property. Level 3 cannot seriously contend that a permit to dig a hole in the ground gives the permitee a proprietary interest in the hole dug. Level 3 did not seek to dig a hole, it sought to embed 5.5 miles of permanent improvements in the rights of way and use them for commercial purposes for 15 years. Ordinance 1736 does not speak to how long the use, how extensive the use, or the nature of the use. As a business matter Level 3 would not want to enter into IRU agreements with third parties without assurance of its right to occupy the right of way.

[18] Affidavit of C. Norwood, paragraphs 11-13P.Exh. 18.

lawyers negotiated the terms of the Agreement; and Level 3 threatened to move the route from Prichard if agreement was not reached.[19]

Level 3 argues that 'The fact that Level 3 accepted the terms and condition at the time, and has been able to provide telecommunications services subject to those terms and conditions does not alter the fact that they are unlawful [under §253(a)]." (brief page 13). This is nonsense. A term or condition is unlawful under §253(a) only if it effectively prohibits the provision of services. The fact Level 3 is able to provide services shows that there was no prohibition.

Because Prichard has not actually or effectively prohibited Level 3 from providing telecommunications services, Level 3's argues that the court should hold *as a matter of law* that Prichard's $2.50 fee for rights of way use effectively prohibits it from providing telecommunications services, because the fee is not limited to recovery of the City's cost of right of way management. According to its reasoning, any use fee in excess of recovery of costs is *de facto* a prohibition.

> This reading of §253 was rejected by the court in *Qwest v. City of Portland*, supra,
>
> Qwest contends §253(a) prohibits the Cities from basing right-of-way fees on Qwest's gross revenues. Qwest's argument depends on its erroneous presumption 'that the only legitimate exercise of local regulatory authority under § 253(a) is the recovery of the costs of the use of local rights-of-way.' § 253 does not address revenue based fees, much less categorically forbid them. See [TCG Detroit v.]City of Dearborn, 206 F.3d. at 624-25 (§253 does not preempt franchise fee equal to 4% of gross revenues). § 253 preempts right-of-way fees only if the fees would effectively prohibit the provision of telecommunications service." Id. at 1257 (internal citation omitted).

---

[19] See Harris affidavit (P.Exh. 12, ¶¶9-27, ¶32) which is keyed to the relevant exchange of drafts. It is worth noting that in the Burkhardt affidavit submitted by Level 3 she characterizes Level 3's participation in the contract negotiation process as making "comments." R.Williams dep. 30:3-8, P.Exh.15.

24

In *TCG Detroit v. City of Dearborn*, *supra*, the court of appeals upheld the lower court's determination that 'fair and reasonable compensation' under § 253(c) may include reasonable 'rent' for the use of the public rights-of-way," upholding a 4% revenue based fee. See Puerto *Rico Telephone Company v. Municipality of Guayanilla*, 283 F.Supp. 534 (D. Puerto Rico. 2003) (municipality's fee of 5% of gross revenues was not per se illegal as a violation of §253); *Qwest Corp. v. City of Santa Fe*, 224 F. Supp.2d. 1305 (D. N.M. 2002)("It does not necessarily follow, however, that cost-recovery is the only type of compensation that directly relates to actual use of local rights-of-way. If Congress had intended to limit local governments to charging cost-based fees for the use of the public rights-of-way, § 253(c) of the federal statute would have used the word 'costs' instead of the word 'compensation.'"). See Jennifer Krebs, <u>Fair and Reasonable Compensation Means Just That: How §253 of the Telecommunications Act Preserves Local Government Authority Over Public-Rights-Of-Way</u>, *78 Wash. L. Rev. 901* (August 2003). Prichard's fee, which is directly based on Level 3's actual linear foot usage of the public right-of-way, is even more closely tied to actual usage than revenue based fees and does not violate §253. [20]

Level 3 complains about several non-economic terms of the Agreement. First, the requirement in Article 10 that prohibits Level 3 from providing telecommunications services in Prichard without first acquiring a franchise. Level 3 has not approached the City to provide services in Prichard.[21] The Agreement permitted Level 3 to use a designated portion

---

[20] What is 'fair and reasonable' compensation is a fact question which cannot be determined on summary judgment. Using the totality of the circumstances approach of the *Dearborn* decision, the relevant facts here would be the sophistication of Level 3 in negotiating the agreement, the terms of the Mobile County agreement which Level 3 provided,   and Level 3's initial offer of $2 per foot.

[21] Meade dep. 80:19-22; 82:7-9; 83:6-9 P. Exh. 13).

of the City right of way, not to engage in any and all types of business. If Level 3 does business in the City, it would, for example, be required to obtain a business license.[22]

Level 3 also complains that Article 3 of the Agreement, which prohibits transfer or lease of substantially all of Level 3's facilities, is preempted by §253.[23] The City has a real interest in ensuring the continued maintenance of the nearly seven miles of conduit buried under the public property, so that the equipment does not become a nuisance. Article 3 expressly conditions the restriction on transfer on the well understood proviso that "Such consent shall not be unreasonable withheld."

Summary judgment on the §253 claim should be denied because Level 3's claim that the Agreement effectively prevented it from providing telecommunications service is not supported by the facts. Because Level 3 has failed to make this threshold showing, it is not necessary to consider whether the terms of the agreement fall within the safe harbor of §253(c). However, he City's $2.50 per linear foot fee does not violate §253. Finally, if Level 3 shows under §253(a) that the City effectively prohibited it from providing services by charging $2.50 per linear foot, there is a genuine issue of material fact whether the use fee constitutes 'fair and reasonable compensation' under §253(c).

---

[22] Level 3 does not have a Prichard business license. It developed in discovery that Level 3 rents the use of its fibers in the Prichard right-of way and space in the Telegraph Road facility to other (undisclosed) telecommunications providers. ( Meade dep. 123:3-22; 132:4-21, P. Exh. 13) It needs to get a business license.
[23] Level 3's attorney, Bebb Francis, reviewed and modified the terms of this Article 3. (P. Exh. 9, Francis e-mail)

VIII.  THE COURT SHOULD DENY LEVEL 3'S SUMMARY JUDGMENT MOTION UNDER TITLE 42 USC SECTION 1983 AND DISMISS THE CLAIM FOR FAILURE TO STATE A CAUSE OF ACTION

Level 3's summary judgment motion as to Count V, alleging a violation of 42 USC § 1983 should be denied, and the cause of action dismissed for failure to state a claim.

First, the §1983 claim has as its predicate that the City violated 47 U.S.C. § 253. The city did not violate § 253. Alternatively, there is at least a factual dispute as to any such violation, as set out above.

Second, the remedy for any alleged violation of § 253 lies in an action under that statute. In *Bellsouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.2d. 1169 (11th Cir. 2001) the court held, as a matter of first impression in the circuit, "… that a private cause of action in federal district court exists under § 253 to seek preemption of a state or local statute, ordinance, or other regulation only when that statute, ordinance, or regulation purports to address the management of the public rights-of-way, thereby potentially implicating subsection (c)." *Id.* at 1191.

The existence of a private cause of action under § 253 precludes relief under § 1983. See *Middlesex County Sewerage Authority v. National Sea Clammers Assn.*, 453 U.S. 1, 20; 101 S.Ct. 2615, 2626-2627; 69 L.Ed.2d 435 (1981);

In *Nextel Partners, Inc. v. Kingston Township*, 286 F.3d. 687, 694-95 (3rd. Cir 2002) the court held

> "… that the TCA [Telecommunications Act] implicitly precludes an action under Section 1983 by creating a comprehensive remedial scheme that furnishes private judicial remedies. While the remedial scheme provided by the TCA is not complicated, we believe that it is comprehensive in the relevant sense; it provides private judicial remedies that incorporate both notable benefits and corresponding

27

limitations. Allowing plaintiffs to assert TCA claims under § 1983 would upset this balance." *Id.* at 694

In *Primeco Personal Communications v. City of Mequon,* 352 F.3d. 1147 (7th Cir. 2003) the Seventh Circuit followed *Nextel Partners,* holding a Telecommunications Act claim could not be asserted under §1983. In so doing the court affirmed the district court in *Primeco Personal Communications v. City of Mequon,* 242 F. Supp 2d. 567 (E.D. Wisc. 2003), in which the court reasoned,

> "...that to permit plaintiffs to assert TCA [telecommunications act] claims under Section 1983 would upset the balance of interests incorporated in the statute, particularly if TCA plaintiffs were able to recover attorney's fees. The court found that congress could not have intended this result because plaintiffs were often large corporations, whereas TCA defendants were typically municipalities, often small ones. The court further stated that to allow TCA plaintiffs to recover attorneys fees might well unnecessarily increase the federal burden on local land use regulation beyond that intended by Congress." *Id.* at 581.

See also *Network Towers, L.L.C. v. Jefferson County, Missouri,* 222 F. Supp. 2d. 1148 (E.D. Mo. 2002) (no cause of action under § 1983 for TCA violation); *Network Towers, LLC v. Town of Hagerstown,* 2002 WL 1364156 (S.D. Ind. 2002)(same).[24]

Finally, as set out in the City's prior motion for partial summary judgment, Level 3's §1983 claim is barred by the two year statute of limitations applicable to such actions.

---

[24] There is a circuit split on the issue. Compare *Nextel Partners,* 3rd Circuit, supra, and *Primeco Personal Communicaitons,* 7th Circuit, supra, with *Abrams v. City of Rancho Palos Verdes,* ____ F.3d. ____, _____ WL _____ (9th Cir. 2004)( holding a cause of action under §1983 for a violation of §253). A panel of the 11th Circuit held a §1983 action could be maintained for a telecommunications act violation in an opinion later vacated. *AT&T Wireless v. City of Atlanta,* 210 F.3d. 1322 (11th Cir. 2000) opinion vacated, 223 F.3d. 1324. *City of Atlanta* was decided prior to the 11th Circuit holding as a matter of first impression that §253 gave an aggrieved party a private cause of action. *Bellsouth Telecommunications, Inc. v. Town of Palm Beach,* 252 F.2d. 1169, 1191 (11th Cir. 2001)

IX. CONCLUSION

For the foregoing reasons the court should:

1. Dismiss counterclaim counts II (illegal tax) and V (§ 1983) and the associated affirmative defenses 6 and 7.

2. Deny summary judgment on the contract counterclaims, counts III and IV (State contract counts) and associated affirmative defenses 3, 4 and 9.

3. Deny summary judgment on counterclaim count I (§ 253), and associated affirmative defenses 2, 5 and 7.

4. Grant such other and further relief as the City of Prichard may be entitled to receive the premises considered.

Arthur J. Madden, III
MADDA0656
Attorney for plaintiff
465 Dauphin St.
Mobile, Alabama 36602
251/432-0380

## Certificate of Service

I hereby certify that I have on this the 25th day of February, 2004, served a copy of the foregoing document on counsel for all parties by placing a copy of the same in the United States mail, first class postage prepaid to the following:

Scott Thompson, Esq.
1919 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006

Arthur J. Madden, III